**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**YAMA WOODCRAFT, INC., d/b/a Cal-Pacific Furniture Mfg. Co., Respondent.**

No. 77–2367.

United States Court of Appeals, Ninth Circuit.

June 29, 1978.

John G. Elligers (argued), Washington, D. C., for petitioner.

Jeffrey C. Freedman (argued), of Goldstein, Freedman, Ownbey & Klepetar, Los Angeles, Cal., for respondent.

Before MERRILL and KENNEDY, Circuit Judges, and BARTELS,* District Judge.

BARTELS, Senior District Judge:

The National Labor Relations Board petitions pursuant to Section 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e), for enforcement of its Order, 228 NLRB No. 169, finding respondent Yama Woodcraft guilty of unfair labor practices under Sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. §§ 158(a)(1) & (5). We find that the Board's Order lacks substantial evidentiary support, and therefore deny enforcement.

*Facts*

In September 1975 the Board certified Furniture Union Local 500, Upholsterers' International Union, AFL–CIO (the union) as the exclusive bargaining representative for the employees of respondent Yama Woodcraft (the company). Contract negotiations between the company and the union began in November 1975. At the initial bargaining session, on November 5, the union submitted a complete contract proposal. At the second session, on February 2, 1976, the company in turn submitted its initial contract proposal. The latter dealt only with economic issues such as wages and fringe benefits, which the union rejected as unacceptable. Between the second and third sessions, the company mailed to the union's chief negotiator, Wiley Smith, its proposals regarding vacations and holidays. At the third bargaining session, on February 27, 1976, the company submitted a contract proposal dealing with non-economic issues.

Although the record is not completely clear on this point, by the end of the first five bargaining sessions, the company and the union had been able to agree on at least three or four, and perhaps as many as ten or eleven, non-economic issues. During the fifth bargaining session held on April 23, 1976, the union submitted a new economic proposal containing a number of concessions favorable to the company. The negotiator for the company, attorney Charles Goldstein, advised the union that he was not in a position to accept or reject the proposal, but promised to notify the union as to the company's position. The next bargaining session, held on June 23, 1976, was conducted by Commissioner Allan of the Federal Mediation and Conciliation Service who attended at the mutual request of the parties. In the course of advising the Commissioner as to the status of negotiations, both the union and the company indicated that because they considered wages the most important issue, they desired to discuss that issue first, and planned to discuss other subjects later.

During the first portion of the June 23 session, Goldstein asked Smith for the union's position on the company's economic proposal. Smith indicated that the proposal was unacceptable and asked for the company's position on the union's economic proposal. Goldstein indicated that he was still unable to state the company's position, but indicated that he would be able to do so later that same day. The negotiations were accordingly recessed for lunch, during which Goldstein was to ascertain the company's position.

Following the lunch recess, Commissioner Allan had the parties caucus in separate rooms. Shortly after these separate discussions had begun, the Commissioner informed Smith that he had been advised that the company had rejected the union's new economic offer and had withdrawn its own economic offer. Commissioner Allan brought the negotiators back together, and Goldstein himself advised Smith of the company's bargaining position. In response, Smith asked Goldstein to discuss non-economic issues, but Goldstein indicated that he did not think that such discussions would be fruitful. At this point, the meeting broke up, but informal conversation contin-

* The Honorable John R. Bartels, Senior United States District Judge, Eastern District of New York, sitting by designation.

ued during which Smith indicated that a strike was likely but suggested additional discussions which Goldstein again indicated were unlikely to be advantageous under the circumstances.

During July 1976 company officials met with employees in small groups, and distributed leaflets, to advise the employees that in the event of a strike, operations would continue and those people who worked would be given the same offer that the company had made to the union. Shortly after the company's leaflet distribution, the union held a meeting, on July 13, 1976, at which Smith described the company's bargaining position. At this meeting a strike vote was taken and the union was authorized to call a strike "at the appropriate time."

Subsequent to these meetings, a final bargaining session, on July 19, was arranged by Commissioner Courtney of the Federal Mediation and Conciliation Service. At the start of the meeting, the negotiators discussed the status of the company's economic proposal, which had been withdrawn. Unable to make progress on the issue of economics, the negotiators were separated to caucus individually. While this caucusing was taking place, Commissioner Courtney advised the union negotiators that if they would accept the company's economic proposal, it would be reinstated. They refused to do so, and the negotiation session was ended.

At the final bargaining session, on July 19, the union made no request for the resumption of discussions on non-economic issues, and made no such request during post-meeting discussions with the company's management. Rather than seeking further negotiations, the union filed unfair labor practice charges on July 26, 1976, and the following day called a strike. The company responded to this strike by putting in effect its last previous wage proposal, and by continuing its plant operations.

In November 1976, NLRB Administrative Law Judge Jerrold H. Shapiro conducted a hearing on the union's charges, and in December 1976 issued a decision. The ALJ found that there was no bona fide impasse, and accordingly found the company guilty of unfair labor practices and ordered it to cease and desist from these practices, resume negotiations upon demand, and reinstate and make whole its striking employees. The Board adopted the ALJ's decision on April 11, 1977, and issued the Order which it now seeks to have enforced.

### Discussion

To grant enforcement of the Board's Order, the Board's findings must be "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). *See Universal Camera v. N. L. R. B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The central question here is the validity of the Board's finding that the parties had not reached a bona fide impasse at the time of the strike, and that therefore the company was guilty of unfair labor practices in making its contract offer directly to its employees and in unilaterally effectuating that offer. In reviewing the Board's findings, we realize that while

[t]here is no fixed definition of an impasse or deadlock which can be applied mechanically to all factual situations which arise in the field of industrial bargaining. . . .

[w]here good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock, the Board is warranted, . . . and perhaps sometimes even required, . . . to make a determination that an impasse existed. (Citations omitted.)

*Dallas General Drivers, W. & H., Local No. 745 v. N. L. R. B.,* 122 U.S.App.D.C. 417, 420, 355 F.2d 842, 845 (1966).

Examining the record in this case, we find substantial evidence to support the Board's decision to the extent it held that the parties had reached an impasse in negotiations on economic issues. However, we do not find substantial evidentiary support for the conclusion that this impasse resulted from a failure by the company to bargain in good faith, nor for the conclusion that the economic impasse did not create an impasse in the negotiations as a whole.

According to the record, the company had not only attended bargaining sessions and made contract proposals to the union, it had actually reached agreement with the union on at least three or four, and perhaps as many as ten or eleven non-economic issues. Although they had anticipated additional discussions on non-economic issues, both the union and the company considered economic issues most important and had expressed their desire to resolve those first. When negotiations on economic issues finally reached an impasse, neither party sought additional meetings on non-economic issues, and subsequently the union went out on strike. Thus, this is not a case in which an employer has refused to bargain on fundamental terms and conditions of employment, concession on which might have produced flexibility and leverage on secondary issues, until those secondary issues had been resolved. *Compare e. g. N. L. R. B. v. Patent Trader, Inc.,* 415 F.2d 190 (2d Cir. 1969); *Korn Industries, Inc. v. N. L. R. B.,* 389 F.2d 117 (4th Cir. 1967). Rather it is a case in which the bargaining positions of both parties produced a bona fide impasse on economic issues which would not have been broken by discussions of secondary non-economic issues. For as the court observed in *American Fed. of Television & Radio Artists v. N. L. R. B.,* 129 U.S.App. D.C. 399, 404, 395 F.2d 622, 627 n. 13 (1968):

> It cannot be doubted that a deadlock on one critical issue can create as impassable a situation as an inability to agree on several or all issues.

Given the centrality of economic issues to both parties, it is apparent that once impasse had been reached on those issues, there was "no realistic possibility that continuation of discussion at that time would have been fruitful." *American Fed., supra,* 129 U.S.App.D.C., at 405, 395 F.2d, at 628. In fact, the negotiations as a whole were clearly at an impasse.

It is well recognized that consistent with its duty to bargain in good faith, a company cannot "circumvent the bargaining representative by an appeal directly to the workers," *American Fed., supra,* 129 U.S.App. D.C., at 406, 395 F.2d, at 629, and therefore may not unilaterally implement its contract proposals. *N. L. R. B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Once negotiations have reached an impasse, however, the employer is under no obligation to continue bargaining with the union, *N. L. R. B. v. United Clay Mines Corp.,* 219 F.2d 120 (6th Cir. 1955), and may communicate directly with its employees. The Board recognized these principles (Record, vol. I, at 27) but found there was no bona fide impasse and that the company was not privileged to communicate with its employees. Indeed it went further and stated that the communication with the employees was designed to undermine the union's position. From our examination of the record, we find no substantial evidence to support these findings and must reject the ensuing conclusion that the company had committed an unfair labor practice by communicating directly with its employees and by placing its previous contract offer into effect. *American Fed., supra,* 129 U.S.App.D.C. at 405, 395 F.2d, at 628; *N. L. R. B. v. Almeida Bus Lines, Inc.,* 333 F.2d 729 (1st Cir. 1964). *Compare Medo Photo S. Corp. v. N. L. R. B.,* 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

Confronted with an economic strike, as distinguished from an unfair labor practice strike, *N. L. R. B. v. International Van Lines,* 448 F.2d 905 (9th Cir. 1971), the company had a right to maintain operations by replacing striking employees, *N. L. R. B. v. Mackay Radio & Telegraph Corp.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), and also to inform its employees of its intention to do so. *Mississippi Extended Care Centers, Inc., d/b/a Care Inn, Collierville,* 202 NLRB 1065 (1973). The fact that the company exercised these rights under the circumstances of this case does not constitute an unfair labor practice.

Accordingly, enforcement of the Board's Order must be, and is hereby, denied.