EXCAVATION–CONSTRUCTION,
INC., Petitioner,

v.

The NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 80–1267.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1980.

Decided Oct. 8, 1981.

Stephan J. Boardman, Washington, D. C. (Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., on brief), for petitioner.

Corinna Lothar Metcalf, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, and WIDENER and MURNAGHAN, Circuit Judges.

WIDENER, Circuit Judge:

The petitioner-employer, Excavation-Construction, Inc. (Company) seeks review of an order of the National Labor Relations Board (Board) finding that it violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by unilaterally implementing a change in the pay rate for Saturday work on its A–14 Rockville, Maryland project; that it violated §§ 8(a)(1) and (3) by discharging three employees engaged in a protected strike; that it violated §§ 8(a)(1) by interrogating Union Steward Gray about an upcoming union meeting; that it violated §§ 8(a)(1) and (5) by unilaterally increasing the pay rate from $8.30 per hour plus a benefits contribution of $.84 per hour to a straight wage of $9.14; and that the strike by Local 639 on August 14, 1978 was an unfair labor practice strike. The Board has applied for enforcement of its order under § 10(e) of the Act, 29 U.S.C. § 160(e). We deny enforcement.

The Company is engaged in general hauling and excavation work in the Washington, D. C. area. Teamsters Local 639 is the labor organization that has been recognized as the representative of its approximately 65 truck drivers.

In the spring of 1978, Local 639 began collective bargaining with a multi-employer bargaining association named Capital Area Trucking Association (Association) as well as with the Company on whose behalf the Association did not bargain. Prior to these negotiations, the Company was bound by a collective bargaining agreement between the Union and Construction Contractors Council. This prior contract contained provisions for time and a half pay for Saturday work without regard to other work done that week. In the negotiations with both the Association and the Company, the Saturday time and a half pay provision was an area of major dispute between the parties. The employers sought a make-up day provision, which is a provision allowing time and a half pay for Saturday except that in the event that inclement weather prevented normal work during the week, Saturday work would be paid at time and a half only for hours in excess of 40 during that week or 8 on the make-up day.

The negotiations between Local 639 and the Association concluded with a make-up day provision included. That provision was later rejected by the union members and the previous time and a half rate for Saturday was substituted.

In April 1978, Larry Campbell, the Company's General Manager, James I. Williams, Local 639 Vice President, and others met to begin negotiations on a new contract between the Union and the Company. As negotiations between Local 639 and the Association were ongoing at that time, the parties agreed to wait and see how those negotiations resulted. On May 19, negotiators for both sides met again, with the Union giving the Company a copy of the Association agreement, which at that point had not been ratified by the membership. That agreement contained a make-up day provision. Another meeting occurred on May 31, with the Company noting that it wanted a make-up day provision. Nothing definitive resulted, however, since the Association agreement had still not been ratified. A June 21 meeting resulted in nothing being decided. On June 23, the Association agreement was ratified absent the make-up day provision.

The Company claimed that it needed the make-up day provision because it had entered into a contract the previous May for the A–14 Metro project in Rockville, Maryland. That bid was made on the basis of a make-up day provision. Additionally, a supplemental collective bargaining agreement for other workers on that project contained language requiring time and a half

pay if any other employees received the same.

On July 6, 1978, the Company sent a telegram to the President of Local 639 which stated:

SUBJECT: METRO JOB–A–14

DUE TO COMPETITIVE FACTORS, AND FOR OTHER GOOD AND SUFFICIENT ECONOMIC REASONS, IT IS THE INTENTION OF EXCAVATION CONSTRUCTION, INC. COMMENCING SATURDAY JULY 15 TO PAY STRAIGHT TIME FOR ALL HOURS WORKED EXCEPT TO THE EXTENT THAT EMPLOYEES WORK MORE THAN 40 HOURS IN ANY ONE WORK WEEK OR MORE THAN 8 HOURS IN ANY WORK DAY, BUT NOT BOTH. THIS MEANS NO PREMIUM PAY, AS SUCH, EXCEPT AS STATED. SHOULD YOU HAVE ANY QUESTIONS PLEASE CALL ME.

On July 11 another meeting occurred. The Company pointed out its problem with A–14 and stated that it would accept the Association contract if it had a make-up day provision for the A–14 project. Local 639 President George indicated that he just could not go to his members with such a request since they knew that everyone else would be getting premium pay. The Company asked for a concession the Union might accept but none was offered. The Union wanted the Association contract with no make-up day provision on A–14. The meeting ended with Union President George stating "I'll take it back to my people but I can tell you right now, they are not going to buy it."

On July 13, George sent a letter to Campbell protesting the Company's actions and stating that the Union would meet regarding the action of the Company as to the Saturday pay provision for A–14 as of July 15, which the Union considered unlawful unilateral action on the part of the Company. George also advised that a vote would be taken regarding a strike if the proposed change with respect to Saturday pay on

A–14 was implemented. On July 14, the Company sent a telegram in reply which included its last and final offer, which was the terms of the Association contract with the exception of a make-up day provision for A–14. The Union met on the night of the 14th. After the Company's telegram was read to the members, the membership voted to reject the Company's last and final offer. The vote was 26–5. The following day, Saturday, July 15, the Company implemented the wage change for job site A–14.

Weekend work for the Company was voluntary, and no pressure was placed on employees to work on weekends. On Friday of each week, a determination was made as to how many employees would be needed to work the following day. Employees then voluntarily signed up to work. Once an employee had signed up, however, he was subject to dismissal if he did not show up for work. Employees did not know until their arrival at work on Saturday morning where they would be working. That decision was made by management on Friday night. Employees were notified of their Saturday job assignments by trip tickets placed in their respective mail slots.

On Saturday, July 15, drivers Robinson, Suggs, and Wellons reported for work after volunteering the day before. All three were assigned to job site A–14. Robinson was the first to arrive for work that day. Upon finding out his job assignment, he told Walter Jones, the truck superintendent, that he would not work A–14 because he had worked less than 40 hours that work week and therefore was not assured of receiving time and a half.[1] Robinson asked to work at any other job, but Jones stated that no other jobs were available. Suggs and Wellons arrived shortly thereafter, and, like Robinson, refused to work job A–14. All three stated that they would work anywhere else but not A–14.

The three men returned to work the following Monday. They were all asked why they had refused to work the previous Sat-

---

1. There is a conflict in the evidence as to whether the three workers had been told the day before that they would be paid time and a half. The Administrative Law Judge concluded that they had not been so told, and the Board accepted this finding.

urday. Wellons stated that on Friday night they were told by the Union not to work for straight time on Saturday. Each agreed, noting that they refused to work because they were not assured that they would get paid time and a half. All were then discharged for refusing to work on the A–14 job on the past Saturday.

Negotiations between the Company and Local 639 continued in August, with the Company still wanting a make-up day provision and the Union opposed. At an August 9 meeting the Company asked the Union if it wanted anything in return for a make-up day provision. The Union responded with a request for a $.50 per hour wage increase for all employees. These August talks additionally included a discussion of the three discharged employees, with the Company agreeing to reinstatement but no back pay. The Union also rejected a me-too offer.

On August 12, 1978, Campbell met with Union Steward Gray in Campbell's office. The two discussed the three discharged employees, with special attention paid to Suggs because Gray thought that he had gotten a bad deal from the firing. Campbell inquired as to whether a vote would be taken at the Union meeting scheduled for the next day. Gray stated that he did not know of any vote being taken at that meeting. Gray stated that he thought the meeting was going to deal with the three discharged employees and with a problem some of the employees were having regarding their pay. The meeting concluded after a discussion of the events leading up to the dismissal of the three drivers.

On August 13, 1978, the Company's employees belonging to Local 639 voted to strike. Among the reasons behind the strike which were discussed at that meeting were the failure of contract negotiations because of the Company's insistence on a make-up day provision and the dismissal of the three employees. The strike began the following day. On August 16, 1978, the Company advertised in Baltimore and Washington newspapers for replacements

for the strikers. The Company advertised the pay at $9.14 per hour.[2]

On August 18, the Company and the Union met. The Company stated its intention to hire permanent replacements if the strike did not end. Campbell told striking workers the same thing on August 19. He spoke to the workers at the picket lines, inviting them to return to work and informing them that new workers would be hired if they did not return. He also told them that the health and pension benefits would not be paid but instead would be included in the pay checks. This $9.14 wage rate became effective on August 21. The Company had not paid premium pay for Saturday work on A–14 except for more than 40 hours per week or 8 hours per day beginning July 15th.

I Impasse

The Administrative Law Judge found that impasse had been reached before the Company changed the Saturday pay for A–14. Therefore, he concluded the change was not an unfair labor practice. The Board, however, disagreed, holding that no impasse existed when the Saturday wage rate was altered. Therefore, the Board found that the Company had committed an unfair labor practice in violation of § 8(a)(1) and (5).

We find that there is not substantial evidence to support the Board's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The evidence clearly shows that the make-up pay provision was the sticking point and centerpiece of the Association negotiations as well as the negotiations at issue here. The parties mutually deferred negotiations on the issue until the Association agreement was worked out, thus hoping to take advantage of the negotiations advanced there. Such deferment does not indicate a lack of negotiations or refusal to negotiate but merely a desire to take advantage of multi-employer negotiations progressing contemporaneously. A defer-

---

**2.** Under the old contract between the Company and Local 639, the wage rate was $8.30 per hour plus $.84 per hour being paid for benefits. There is no dispute as to these facts.

ment of negotiations by mutual agreement, as here, is no evidence of unwillingness to negotiate. And it is acknowledged by all that the Company offered to accept the Association agreement with the exception of the Saturday pay provision. In addition, the make-up day provision was specifically discussed at negotiation sessions between the Company and Local 639 after the Association agreement was ratified. There, Union President George said that his members would not accept such a provision. In reality, they did not.

At the time the Saturday overtime change was implemented, even if not when proposed, an impasse existed.[3] The Company had made its last and final offer which the Union had voted to reject. At that point, it cannot be said that there was a realistic possibility that negotiations would be fruitful. *Taft Broadcasting Co.,* 163 NLRB 475 (1967), pet. for review den. *sub nom. American Federation of Television and Radio Artists v. NLRB,* 395 F.2d 622 (D.C.1968). We especially note that there is no allegation made by the Board that the Company did not bargain in good faith; it only alleges that the Company did not bargain to impasse. There is not substantial evidence in the record to support the Board's conclusion that the Company changed the Saturday wage rate before impasse was reached. The Union had considered and voted to reject the Company's last and final offer before the Saturday wage change was implemented by the Company. Thus, the parties were at an impasse with the Union's rejection of the offer.

## II Discharge of Employees

The Board adopted the Administrative Law Judge's conclusion that the three employees were improperly discharged in violation of § 8(a)(1), 29 U.S.C. § 158(a)(1), because they were involved in protected concerted activity, and § 8(a)(3), 29 U.S.C. § 158(a)(3), because of their union membership or activities. He found the Company had violated both §§ 8(a)(1) and 8(a)(3). In reaching such a conclusion, the Administrative Law Judge rejected the Company's

contention that the workers were involved in an intermittent, partial strike unprotected by the Act. The Administrative Law Judge found that the three workers were involved in a one-day strike, not in an intermittent one. It is clear that the three men refused to work and only refused to work on the A–14 job. The question is whether such action was concerted activity protected under the Act.

■ Section 7 of the Act, 29 U.S.C. § 157, guarantees employees the right to engage in concerted activity. An employer violates § 8(a)(1) of the Act when he discharges employees engaged in concerted activities protected by § 7. Such activities are generally protected by the Act unless they are unlawful, violent, in breach of a contract, or otherwise indefensible. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962); *NLRB v. Waco Insulation,* 567 F.2d 596 (4th Cir. 1977). There is no question here but that the refusal to work of the three discharged drivers was concerted. The Union meeting of July 14th decided that question. The only question left then is whether their refusal to work is protected. If it is, the Company violated the Act by discharging these employees, and enforcement would be proper. Work stoppages in protest of working conditions are protected by the Act. *Washington Aluminum,* supra.

■ This protection, however, does not extend to partial, recurrent, or intermittent work stoppages. *G. C. Conn Ltd. v. NLRB,* 108 F.2d 390 (7th Cir. 1939). In *Conn,* employees refused to work overtime because of a dispute regarding the rate and hours for overtime pay. Without giving the employer prior notice, the employees left the work place at the end of the regular work day even though overtime work was scheduled for that evening. There was evidence they intended to do the same each day until their demands were met. The next day those employees returned to work. All of the employees who signed a statement that they would not work overtime according to

---

**3.** We need not consider whether an impasse existed prior to the 14th for it in fact existed at least with the Union's rejection of the Compa-

ny's last and final offer at the Union meeting on July 14th.

company rules were discharged. The court of appeals refused to enforce the Board's order that the employees were engaged in protected concerted activity, noting that the employees had two choices available to them regarding their wage dispute. They could continue to work and negotiate further or they could strike. They could not, however, do both. By doing both they would be working "upon terms prescribed solely by [themselves]." *Conn* at 397. The Act does not protect such conduct by employees.

This court followed *Conn* in *Home Beneficial Life Ins. Co. v. NLRB*, 159 F.2d 280 (4th Cir.), cert. den. 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344 (1947), a case indistinguishable on its essential facts from the case now before us. The employer in *Home Beneficial* had a rule that agents had to report to the office each morning before serving their respective routes. A group of agents advised the company that they would report on Wednesdays and Thursdays only, but not the other days. They were discharged when they did not report to the office in accordance with the company rule. We upheld the lawfulness of their discharge because they were seeking to set the terms of their own employment. In *NLRB v. Mt. Clemens Pottery Co.*, 147 F.2d 262 (6th Cir. 1945), the Sixth Circuit reached a like result for employees who refused to work overtime, as did the Eighth Circuit in *NLRB v. Montgomery Ward & Co.*, 157 F.2d 486 (8th Cir. 1946), for employees who refused to perform a part of their clerical duties.

The cases point to a distinction between single refusals to work over working conditions and recurrent refusals to perform a particular job. *NLRB v. Gulf-Wandes Corp.*, 595 F.2d 1074 (5th Cir. 1979); *First National Bank of Omaha v. NLRB*, 413 F.2d 921 (8th Cir. 1969), the first being protected activity, the latter not being protected. Following this reasoning, the Administrative Law Judge stated that the men did not know at what rate they would be paid for working Saturday, July 15, and that they went to work that day to find out. If straight time had been paid, the men would

refuse to work that day. In the future the men would simply not volunteer for weekend work, a permissible decision under company rules. Thus, he concluded the three employees were engaged in a one-day strike protected under the Act. The Administrative Law Judge noted that their return to work the next Monday showed that the strike was of limited duration. The holding of the Administrative Law Judge was upheld by the Board.

■ There is no basis in the record for such a conclusion. The union members, including the three affected employees, knew that A–14 would only pay straight time. Campbell met with the employees and told them of the proposed change on July 14. At the Union meeting on the night of the 14th, the Company's telegram was read in which it was stated, with unmistakable clarity,[3A] that straight time would be paid on the A–14 job, except for more than 40 hours that week or 8 hours that day. The members voted and specifically rejected those terms and agreed not to work weekends for straight time. As Union Steward Gray stated, "[w]e just made an agreement not to work on Saturdays and Sundays at straight time." Clearly, the employees knew what the Saturday wage rate would be for the A–14 job when they voted against accepting it. Additionally, we note the Administrative Law Judge, with the concurrence of the Board, rejected the three men's contention that they had been promised time and a half for working that particular Saturday.

Likewise, there is no substantial evidence in the record to support the conclusion that the men would simply not volunteer for weekend work from then on. Not only is there no evidence to that effect in the record, such a conclusion is inconsistent with the affected employees' own testimony. The men's only refusal was to work the A–14 job on weekends. They would work any other job. In fact, all three sought to work at another job site on the Saturday in question. The testimony is uncontradicted that the men would have worked overtime

---

**3A.** The Company's July 6 telegram left no room for doubt.

at any job site but A–14. There is nothing in the record from which it may be inferred that the refusal to work was confined to the particular Saturday in question. The vote at the union meeting the night before was not so limited. The men, then, were seeking to continue to work under terms prescribed by themselves alone, and were not engaged in a single, isolated, concerted protest against conditions of employment. Their activity is not protected by the Act.

### III Interrogation of Gray

■ The conversation in question took place the day before the August 13 meeting at which the Union voted to strike. Campbell, of course, knew of the previous July meeting at which the Union voted to reject the make-up day provision concerning Saturday pay. It is obvious from the record also that everyone knew of the August 13 meeting. The entire conversation was tape recorded and transcribed, so we do not have to deal with problems of credibility as to what was said. The inquiry Campbell made of Gray concerning the August 13 meeting was this: "Do you know what the vote going to be tomorrow. I mean what's its going to be about?" Gray answered that he did not know of any vote tomorrow, that the meeting was going to be about the make-up day and apparently some complaints about some employees not getting paid due to sickness of one Jr., Jr. being a clerical or supervisory employee. The vast majority of the conversation concerned the three drivers who had been laid off and Gray's efforts especially to get the Company to put Suggs back to work, Gray being convinced that Suggs was operating under a misunderstanding in signing up for work on the Saturday in question, although the other two might not have been. There was no threat, expressed or implied, in the conversation, and even Gray in his testimony did not intimate such. Neither did the Board find any threat in the conversation. The only thing the Board takes exception to in the conversation is that Campbell wanted "to find out what the union was voting on," and that he gave no assurances to Gray against reprisals. An interrogation, not itself threatening, is not an unfair labor practice unless it meets certain fairly severe standards. *NLRB v. Dorn's Transporta-*

*tion,* 405 F.2d 706 (2d Cir. 1969). The proper inquiry in such a case, as held in *Dorn's Transportation,* is that set out in *Bourne v. NLRB,* 332 F.2d 47 (2d Cir. 1964). This circuit in *NLRB v. Consolidated D Elec. Co., etc.,* 469 F.2d 1016 (4th Cir. 1972), n. 9, p. 1020, has also adopted the *Bourne* standards as the "test to be applied to an interrogation in passing on whether it will support a finding of impropriety under the Act." The *Bourne,* p. 48, standards are:

(1) The background, i. e., is there a history of employer hostility and discrimination?

(2) The nature of the information sought, e. g., did the interrogator appear to be seeking information on which to base taking action against individual employees?

(3) The identity of the questioner, i. e., how high was he in the company hierarchy?

(4) Place and method of interrogation, e. g., was employee called from work to the boss' office? Was there an atmosphere of "unnatural formality"?

Analyzing those standards against the facts here, we see that the Board has found a mere inquiry, without assurance against reprisal, to be an unfair labor practice although unaccompanied by threats of reprisal or otherwise. This is not consistent with *Bourne* and *Consolidated D.*

■ The Company had no history of employer hostility to unions or discrimination. In addition, it was guilty of no unfair labor practices in the dispute at hand. Cf. *Winchester Spinning Corp. v. NLRB,* 402 F.2d 299 (4th Cir. 1968).

Campbell did not appear to be and was not in fact seeking information from Gray upon which to base taking action against individual employees.

While Campbell was the General Manager of the Company, Gray was a Steward of the Union. Nothing in the conversation indicates that Campbell tried to exert any pressure on Gray to take any particular action with respect to any union activity in the conversation. Absent some kind of otherwise illegal conduct, we are of opinion there is no reason a company official may

not talk to a union official about a labor dispute.

The conversation apparently took place in Campbell's office, but there was no atmosphere of unnatural formality shown by the transcript of the conversation or any testimony with respect to the meeting. Indeed, the parties have seemed satisfied to let the transcript speak for itself.

To Campbell's question as to what was going on, Gray answered, apparently truthfully, that the meeting concerned the make-up day and the complaint of some of the employees about not receiving pay due to the sickness of Jr. This is verified by Gray's testimony in his brief and only mention of the reason for the August 13 union meeting.

Thus, the Board's holding that a mere interrogation with no intimation of threat or reprisal, unaccompanied though it may be with no assurances against reprisals, is an unfair labor practice, is in error for it does not meet the standard of *Bourne* which has been adopted in this circuit by *Consolidated D.*

### IV Pay Increase

The Board, in rejecting the opinion of the Administrative Law Judge, found that the Company had violated § 8(a)(5) of the Act when it changed from paying $8.30 per hour plus $.84 per hour in pension and hospitalization benefits contributions to paying a straight $9.14 per hour to replacements and offering the same to non-striking drivers during the strike by Local 639. The Administrative Law Judge, noting that the unfair labor complaint was not because of the change of form of the payment of wages but alleged to be "a wage increase for employees in excess of any offer made to the Union during contract negotiations," found that there was no wage increase.

Only a change in the form of payment had occurred. Accordingly, the Administrative Law Judge would have dismissed this part of the complaint.

The Board, however, concluded that such a change represented a wage increase unilaterally granted in violation of § 8(a)(5). Further, the Board concluded that the Company violated § 8(a)(1) of the Act by telling striking employees that they would be paid if they worked the $9.14 per hour with no hospitalization or pension benefits payments. The Board concluded that, since an offer did amount to a wage increase, the Company unlawfully offered increased wages to strikers if they would return to work.

Generally, it is an unfair labor practice for an employer to unilaterally make changes in the conditions and terms of employment subject to mandatory bargaining, including wages, either before or after the expiration of a collective bargaining agreement, at a time when the employer is under an obligation to bargain. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. Cone Mills Corp.*, 373 F.2d 595 (4th Cir. 1967). While the Board is correct in noting that it may be held unlawful for an employer to unilaterally increase wages without first giving notice and conferring with the union on the matter, such wage increase did not occur here. The Board's complaint is that the Company unilaterally paid employees more than its best offer to the Union. There is no substantial evidence, based on the record as a whole, to support such a conclusion. The Company was paying the exact amount offered to the Union in negotiations. Finding no unlawful wage increase, we do not enforce the Board's order with respect to that matter.[4]

---

**4.** An alternate reason we give for our decision is that the general law is that an employer has a right to unilaterally change terms and conditions of employment after it has bargained to impasse with a union. The fact that the union has gone on strike merely adds emphasis to the rule. In this case the Company did not change even the form of wages until August 21, a week after the strike had commenced on August 14, and more than a month after the parties had bargained to impasse on July 14. In the same or similar factual situations, at least the following cases which we follow have authorized increases in wages following bargaining to impasse. *NLRB v. United Brass Works, Inc.*, 287 F.2d 689 (4th Cir. 1961); *NLRB v. Yama Workcraft, Inc.*, 580 F.2d 942 (9th Cir. 1978); *Gulf States Mfrs. Inc. v. NLRB*, 579 F.2d 1298 (5th Cir. 1978).

**1024**

### V Nature of the August Strike

The Board concluded that the strike by Local 639 on August 14, 1978 was an unfair labor practice strike, thus making unlawful the permanent replacement of strikers. Because we have previously determined that the Company had committed no unfair labor practices, the strike was an economic one not entitling the strikers to reinstatement. *Radiator Specialty Co. v. NLRB*, 336 F.2d 495 (4th Cir. 1964); *NLRB v. United Brass Works, Inc.*, 287 F.2d 689 (4th Cir. 1961).

We are thus of opinion that the petition for review is well taken and the Board's request for enforcement of its order is not.

*ENFORCEMENT DENIED.*