738 F.2d 1038
 117 L.R.R.M. (BNA) 2139, 101 Lab.Cas. P 11,123
 FINANCIAL INSTITUTION EMPLOYEES OF AMERICA, LOCAL NO. 1182,
CHARTERED BY UNITED FOOD AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Seattle-First National Bank, Intervenor.
 C.A. No. 83-7785.
 United States Court of Appeals,
Ninth Circuit.
 Submitted May 7, 1984.
Decided July 24, 1984.
 
 Edward Wendel, United Food and Commercial Workers International Union, Washington, D.C., for petitioner.
 Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for respondents.
 On Petition for Review of Order of The National Labor Relations Board*.
 Before SNEED and FLETCHER, Circuit Judges and JAMESON,** district judge.
 PER CURIAM:
 
 
 1
 Financial Institution Employees of America, Local No. 1182, chartered by United States Food and Commercial Workers Union, AFL-CIO (the Union) has petitioned for review of a supplemental order of the National Labor Relations Board dismissing the Union's complaint of alleged violations by the Seattle-First National Bank, Intervenor, of Section 8(a)(5) and (1) of the National Labor Relations Act as amended, 29 U.S.C. Sec. 158(a)(1) (1982). We deny the petition for review.
 
 I. Prior Proceedings
 
 2
 The initial decision of the Board found that the Bank had violated Section 8(a)(5) and (1) by failing to bargain in good faith and by implementing portions of its last offer before reaching a valid impasse. This court in Seattle First National Bank v. NLRB, 638 F.2d 1221 (9th Cir.1981), found that the Board had improperly relied exclusively on inferences drawn from specific contract proposals. The Court denied enforcement of the Board's order and remanded to the Board to re-examine the record "to determine whether the record as a whole, including the course of negotiations as well as the contract proposals, supports a finding of bad faith." The court also directed the Board, if on remand it found that the Bank did bargain in good faith, to address the question of whether an impasse was reached before the unilateral change in wages and working conditions.[1]
 
 
 3
 The Board reconsidered its decision in light of the entire record, statements of position of the parties, and this court's remand. The Board then dismissed the complaint in its entirety, finding that (1) the Bank did not bargain in bad faith, and (2) the parties reached a valid impasse in negotiations, justifying the Bank's implementation of its final offer.
 
 II. Petitioner's Contentions
 
 4
 All parties recognize that the Board's findings must be accepted as conclusive if supported by substantial evidence on the record considered as a whole. 29 U.S.C. Sec. 160(e) (1982); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); NLRB v. Vista Hill Foundation, 639 F.2d 479, 483 (9th Cir.1980). The petitioner Union contends that the following findings of the Board are contrary to the evidence or based upon a misrepresentation of the record:
 
 
 5
 (1) the Board's finding that the Bank's delay in providing information to the Union prior to negotiations was not evidence of bad faith;
 
 
 6
 (2) the Board's failure to find bad faith on the part of the Bank in failing to provide information to which the Union was entitled;
 
 
 7
 (3) the Board's finding that the Bank did not impose an impossible deadline for acceptance of its final offer; and
 
 
 8
 (4) the Board's finding that the Bank did not unilaterally implement its contract proposal without benefit of a valid impasse.
 
 
 9
 III. Bank's Delay in Providing Information to Union Prior to
 
 Negotiations
 
 10
 The Union argues that "the Bank engaged in unconscionable delays in supplying information...." The Board concluded:
 
 
 11
 The initial delay in providing the information is suspect; however, under the circumstances of this case we do not draw an inference of bad faith. We especially note that the Union expanded its request on 6 December, and that the Respondent agreed to a target date and, apparently in good faith, informed the Union when it became aware that it would not be able to meet the target date and the reason therefor. The Union did receive the information and it was prepared 2 months before the first bargaining session. Additionally, while an exchange of letters in early December indicates "posturing" by both parties, on 4 January 1977 the Union asked for more information and the Respondent by letter dated 5 January agreed to provide the information and did so on 12 January. Similarly on 18 January the Respondent replied to a request dated 17 January and the information was supplied in early February. Based on the foregoing we cannot say that the Respondent's conduct in this regard evidenced bad faith.
 
 
 12
 While the delay was substantial, the Bank offered a reasonable explanation and there was no evidence that the delay was a mere "cover-up" to "frustrate the Union's request." See Emeryville Research Center v. NLRB, 441 F.2d 880 (9th Cir.1971). Moreover, the Union itself contributed to the delay.
 
 
 13
 While different inferences may be drawn from the facts, most of which are undisputed, we are satisfied from our review of the history of the negotiations that there was substantial evidence to support the Board's finding that the Bank's delay did not constitute a failure to bargain in good faith.
 
 
 14
 IV. Bank's Failure to Continue Supplying Employee Status
 
 Reports
 
 15
 The second incident urged by the Union as evidence of bad faith bargaining by the Bank is the Bank's decision in November, 1977 to stop providing the Union with employee status reports. The contract required the Bank to furnish the Union with monthly reports. Before the contract expired on July 31, 1977, the parties agreed to extend it indefinitely subject to termination on 10 days notice by either party. On October 20 the Bank presented its last and final offer together with notice terminating the contract on November 1. Consequently, after November 1, the Bank stopped supplying the employee status reports. The Union protested the decision on December 9, 1977 and on January 4, 1978 asserted that the information contained in the reports was necessary to negotiations. The following day the Bank agreed to furnish the information and shortly thereafter did provide most of the data contained in the status reports. The Bank also billed the Union for $67, the cost of producing the reports. The Union then claimed the information was incomplete in several particulars and requested complete reports. The Bank complied in early February and did not bill the Union further.
 
 
 16
 We agree with respondent that the Bank had a right to stop producing the required reports under the terminated contract, at least until the Union asserted they were necessary to its negotiating efforts. It is true, as petitioner contends, that even after expiration of a collective bargaining agreement, the employer may not make unilateral changes in "terms and conditions of employment," as they are defined in 29 U.S.C. Sec. 158(d), absent a bargaining impasse. NLRB v. Sky Wolf Sales, 470 F.2d 827, 830 (9th Cir.1972) (citing Hinson v. NLRB, 428 F.2d 133 (8th Cir.1970)). This court has also held, however, that "the phrase 'terms and conditions of employment' is to be interpreted in a limited sense which does not include every issue that might be of interest to unions or employers." Seattle-First National Bank v. NLRB, 444 F.2d 30, 32 (9th Cir.1971). The Union does not contend, and there is no reason to conclude, that the employee status reports constitute "terms and conditions of employment."
 
 
 17
 V. Bank's Deadline for Acceptance of its Final Order
 
 
 18
 On October 20 the Bank made its last and final offer and notified the Union that it would terminate the extended contract and implement portions of the offer if the Union had not accepted it by November 1. The Union contends that the ten days within which the bank demanded acceptance was patently insufficient time for the Union to ratify the contract and was evidence of the Bank's bad faith. The Union does not assert that it was given insufficient notice of the termination.
 
 
 19
 The Board rejected the Union's contention and found, based on the Bank's letter of October 20, that the Bank was "seeking approval of its final offer from the bargaining committee," not the union membership. The Board, therefore, declined to find bad faith in the Bank's conduct. The record fully supports this conclusion. For example, the Bank addressed the letter to the union president with a copy to the bargaining committee. The Bank did not mention the membership or ratification but simply urged that "you will reconsider." Since the Union did not request additional time to study the offer and nothing suggests that ten days was insufficient for that purpose, the Board's conclusion is clearly right.
 
 VI. Impasse
 
 20
 As noted, an employer may not unilaterally alter the terms and conditions of employment absent a bargaining impasse. NLRB v. Sky Wolf Sales, 470 F.2d at 830. Here, after 36 bargaining sessions, the Bank implemented portions of its final offer on November 1, 1978, but continued to negotiate with the Union on numerous issues. The parties agree that numerous issues remained negotiable after November 1, and in fact the parties met a total of ten times between November and mid-March. The Union contends that these facts preclude a finding that the parties had bargained to an impasse. The Board, however, found that the parties bargained to an impasse on several issues, "the most important of which was the [Bank's] adamant refusal to provide dues checkoff." The Board also noted that "the contemporaneous understanding of the parties supports a finding of impasse."
 
 
 21
 The Board relies on NLRB v. Yama Woodcraft Inc., 580 F.2d 942 (9th Cir.1978), where the parties had bargained to an impasse on some economic issues, but negotiations continued for some time over noneconomic issues until the union filed unfair labor practice charges and called a strike. This court, while acknowledging that " '[t]here is no fixed definition of an impasse or deadlock,' " observed:
 
 
 22
 "Where good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock, the Board is warranted, ... and perhaps even required, ... to make a determination that an impasse existed."
 
 
 23
 Id. at 944 (quoting Dallas General Drivers Local 745 v. NLRB, 355 F.2d 842, 845 (D.C.Cir.1966)). It was also noted " 'that a deadlock on one critical issue can create as impassable a situation as an inability to agree on several or all issues.' " Id. at 945 (quoting American Federation of Television & Radio Artists v. NLRB, 395 F.2d 622, 627 n. 13 (D.C.Cir.1968)). The court concluded that the impasse on economic issues meant that "negotiations as a whole were clearly at an impasse." Id.
 
 
 24
 Similarly, here the parties were clearly deadlocked over the dues checkoff issue among others. While progress might have been made on some issues, the negotiations as a whole were deadlocked when the Union rejected the Bank's October 20 offer.[2] Even though the parties met to bargain again after November 1, there were no definite plans at that time for further negotiation and, as the Board found, the parties regarded themselves deadlocked.
 
 
 25
 The Supreme Court recently cited with approval the Board's description of impasse which is particularly suited to the present case:
 
 
 26
 As a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations "which in almost all cases is eventually broken, through either a change of mind or the application of economic force."
 
 
 27
 Charles D. Bonanno Linen Service Inc. v. NLRB, 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982) (citations omitted). In this case, the question before the Board was not whether an impasse continued beyond November 1 but whether the negotiations were deadlocked on November 1 when the Bank unilaterally implemented portions of its offer. The record supports the conclusion that a deadlock existed on that date. Further, this court has cited with approval the decision in Dallas General Drivers Local 745 v. NLRB, 355 F.2d 842 (D.C.Cir.1966) where the court observed that
 
 
 28
 impasse is a question of fact involving the Board's presumed experience and knowledge of bargaining problems.... But in the whole complex of industrial relations few issues are less well suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of the board which deals constantly with such problems.
 
 
 29
 Id. at 844-45 (cited in Yama Woodcraft, Inc., 580 F.2d at 944). The Board's finding of an impasse is reasonable and supported by substantial evidence.
 
 
 30
 The petition for review is denied.
 
 
 
 *
 The panel finds this case appropriate for submission without oral argument pursuant to Ninth Cir.R. 3(a) and Fed.R.Appl.P. 34(a)
 
 
 **
 The Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation
 
 
 [1]
 For a discussion of the factual background and applicable statutes see prior decision of the court, Seattle-First National Bank v. NLRB, 638 F.2d 1221 (9th Cir.1981)
 
 
 [2]
 Moreover, the administrative law judge found a deadlock without objection from the Union:
 It is undisputed that a bargaining impasse was reached in late October, incidental to the offer of October 20. Even so, and despite [the bank's] unilateral action of November 1, negotiations proceeded. On December 5, [the Bank] presented a revised final offer which likewise was rejected.