564 F.Supp. 1285 (1983)
I.A.M. NATIONAL PENSION FUND, BENEFIT PLAN C, and Alan W. Skolnick, Fund Director, Plaintiffs/Counterdefendants,
v.
SCHULZE TOOL AND DIE CO., INC., a corporation, d/b/a Schulze Manufacturing, Defendant/Counterclaimant.
No. C-82-2954 RFP.
United States District Court, N.D. California.
May 24, 1983.
*1286 *1287 Alf R. Brandin, Lillick, McHose & Charles, San Francisco, Cal., for plaintiffs/counterdefendants.
William F. Terheyden, Nancy L. Ober and J. Richard Thesing, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for defendant/counterclaimant.

MEMORANDUM OF DECISION
PECKHAM, Chief Judge.
Plaintiff I.A.M. National Pension Fund, Benefit Plan C ("the Plan") brought this action against defendant Schulze Tool and Die Company ("Schulze") to collect both monthly contributions and withdrawal liability which the Plan claims Schulze owes to it under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"). Schulze counterclaimed for declaratory and injunctive relief, maintaining that it owed neither contributions nor withdrawal liability because it withdrew from the Plan prior to the effective date of the Act and made all required contributions prior to its withdrawal. Schulze also challenges the constitutionality of the MPPAA both facially and as applied.
Schulze brought a motion for summary judgment embracing both constitutional and non-constitutional issues. The court ordered a bifurcation, proceeding first with Schulze's non-constitutional claims, since these could potentially dispose of the action without the necessity of reaching the constitutional issues. The matter came on for hearing and having granted Schulze's motion on March 31, 1983, the court now enters this memorandum of decision.

*1288 FACTS
The factual record on this motion consists of declarations offered by Schulze. The Plan did not submit any evidentiary matter.
Schulze is a small manufacturer of precision metal parts primarily for computers and related equipment. It employs approximately fifty people. From 1960 until March 31, 1980, Schulze was a party to collective bargaining agreements between the California Metal Trades Association ("CMTA"), an employer association, and various lodges of the International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM"). Pursuant to those agreements, Schulze made monthly contributions to the Plan. During the last of the agreements, Schulze timely withdrew its bargaining authorization from CMTA and prepared to negotiate its own individual agreement.
Schulze's proposal, first presented on March 5, 1980, contained two major departures from the CMTA agreement. It called for a production worker wage rate that was 75 percent of the specialist wage rate, and for employees to be covered under the company pension plan rather than the IAM Plan. The union presented Schulze with the same proposals it was presenting in the CMTA negotiations. Meetings were held on March 5, March 13, March 20, and March 25. Minor items like tool insurance and safety conditions were agreed on in the March meetings, but the union was unwilling to state a firm wage position until the conclusion of the CMTA negotiations. At the March 25 meeting, the parties agreed to extend the old agreement from March 31 to April 14, 1980.
Meetings were held on April 7, 11, and 14. At the April 11 meeting, the union stated that its proposal was the contract it had just reached with the CMTA. At the April 14 meeting, the union said it would not deviate from the wage provisions of the CMTA agreement. The company responded that achievement of the lower production worker rate was the reason it had entered separate negotiations. The union replied that if the company would not agree to have the same production worker rate as in the CMTA agreement, then the company should present its "best and final offer" and the union negotiators would take it back for a membership vote.
The company did make a final offer on April 14. It provided that newly hired production workers would be paid at 75 percent of the specialist rate and that the wages of existing production workers would be frozen until the contractual rate exceeded the frozen rate through cost-of-living increases. The offer also stated that employees would have the option of coverage under the company pension plan or the IAM Plan. The company believed employees would receive more benefits under its plan and so expected most employees to select it over the IAM Plan. In orally presenting the final offer, the company's negotiator, attorney J. Richard Thesing said that if the employees rejected the offer and struck, the company would withdraw the pension option and would insist on its own plan.
On April 15, 1980, the employees rejected the final offer and voted for a strike, which began that day. The company immediately began hiring permanent replacements. Approximately three (or possibly four) subsequent meetings were held, called each time by a federal mediator at the request of the union. Such meetings occurred on May 5, 1980, June 9, 1980, and July 10, 1980. Slight modifications of each side's position took place over the course of these meetings, but the company adhered to its position of creating a 25 percent wage differential between production workers and specialists; the union never found this position acceptable. After an exchange of letters between Thesing and the union in September and October, at the conclusion of which the company put forth its complete proposal in writing, all contact ceased. On December 12, 1980, Schulze's employees voted to decertify the union.
Schulze ceased making contributions to the Plan after April 14, 1980. After the decertification vote in December, the Plan sent a series of contradictory notices to Schulze. The first stated that the company *1289 had terminated its participation in the Plan on March 31, 1980, the expiration date of the old CMTA agreement. A second letter stated that the termination date of the company's obligation to contribute was December 12, 1980 and that withdrawal liability would be assessed. Subsequently, by letter dated July 24, 1981, Schulze was notified that it owed the Plan withdrawal liability of $412,719, and that the initial payment was due by September 23, 1981. Schulze requested the Plan trustees to review their determination in light of the fact that an impasse had been reached prior to April 29, 1980, the effective date of MPPAA's withdrawal liability provisions. On December 3, 1981, the Plan notified Schulze that the assessment of withdrawal liability was correct and the next day notified the company that it was in default. This action followed.

DISCUSSION
The dispositive issue on this motion involves the timing of Schulze's withdrawal from the Plan. The date on which Schulze withdrew from the Plan figures in this action in two ways: First, whether Schulze is subject to withdrawal liability under MPPAA depends on whether Schulze withdrew from the Plan prior to the effective date of the Act's withdrawal liability provisionsApril 29, 1980. 29 U.S.C. § 1461(e). Second, the date of withdrawal and the cessation of Schulze's obligation to make regular monthly contributions to the Plan are statutorily intertwined.
Under the statutory scheme, an employer becomes liable for withdrawal liability upon a complete or partial withdrawal from a multiemployer plan. Id. § 1381(a). A "complete withdrawal" occurs when an employer either "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." Id. § 1383. An "obligation to contribute" is defined as "an obligation to contribute arising  (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law ...." Id. § 1392.
Schulze contends that its obligation to contribute under the collective bargaining agreement terminated with the expiration of the collective bargaining agreement on March 31, 1980, or, at the latest, at the end of the extension period, April 14, 1980. Schulze concedes that after expiration it continued to be obligated to contribute until its negotiations with the union for a new agreement reached an impasse, at which point, under well-established labor law principles, it was free to impose its prior bargaining position. Schulze argues that impasse was reached no later than April 15, 1980, at which time Schulze implemented its own pension plan and withdrew from the IAM Plan.

A. Exhaustion of Remedies
The threshold issue is whether the court can and should reach the merits of Schulze's non-constitutional claim when Schulze has not exhausted the arbitration remedy available to it under the Act. Congress provided that "[a]ny dispute between an employer and the plan sponsor ... concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C.A. § 1401 (a)(1). Sections 1381 through 1399 establish withdrawal liability and set forth its criteria and the methods for determining and collecting it.
Schulze argues that if it had no obligation to contribute to the Plan after the effective date of the Act, then the Act's arbitration procedures do not apply. Schulze cites one case, Speckman v. Barford, 535 F.Supp. 488 (E.D.Mo.1982), in which the court held that the defendant had ceased all covered operations prior to April 29, 1980 and, therefore, had no withdrawal liability and was not required to engage in arbitration concerning such liability, even though the plan sponsor disputed the timing of the withdrawal. Id. at 491. This court respectfully differs with the reasoning of the Speckman court. The Plan trustees have determined that Schulze withdrew from the Plan on December 12, 1980. *1290 Schulze disagrees. This is "a dispute ... concerning a determination made under sections 1381 through 1399..." 29 U.S.C. § 1401(a)(1). If a dispute between an employer and a plan sponsor were to arise over whether withdrawal occurred in December, 1980, or January, 1981, the dispute would clearly be subject to the arbitration procedures of the Act. This result should not change because the employer happens to be arguing for a date preceding the effective date of the Act.
Since the dispute falls within the scope of the arbitration provisions, the court must determine whether the exhaustion doctrine requires us to dismiss or remand Schulze's claim. It is "a long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The basic purpose of the doctrine is
to allow an administrative agency to perform functions within its special competenceto make a factual record, to apply its expertise and to correct its own errors so as to moot judicial controversies. Parisi v. Davidson, 405 U.S. 34, 37 [92 S.Ct. 815, 817, 31 L.Ed.2d 17] (1972); Marshall v. Burlington, 595 F.2d 511, 513 (9th Cir. 1979).
Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 499 (9th Cir.1981).
A recent case from the Third Circuit has held that the policies underlying the exhaustion doctrine are applicable to the arbitration proceedings established by MPPAA. Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290 (3d Cir.1982) (hereinafter cited as Republic). The court rejected a contention that the exhaustion doctrine is inapplicable to decisions of a private arbitrator who is appointed on an ad hoc basis and therefore assertedly lacks expertise. The court stated that,
Congress, in enacting MPPAA, expressed a clear preference for self-regulation through arbitration, 29 U.S.C. § 1401(a)(1); provided for judicial review in the event that arbitration failed to resolve the controversy, id. § 1401(b)(2); and established an elaborate procedural framework to guide the arbitrator, id. §§ 1381-1461. Thus, in accordance with the exhaustion doctrine's policy of deference to Congress, the legislature's decision that arbitration, and not the courts, is the proper forum for the initial resolution of disputes should be respected.
Application of the exhaustion doctrine to arbitration proceedings also is consistent with the policies of the doctrine. The autonomy of the arbitration process is promoted by forbidding the interruption of that tribunal's proceedings until it has exercised its discretion and applied its expertise. In addition, arbitration can further the goals of judicial economy and judicial restraint either by resolving a complaining party's grievance, thereby mooting an appeal concerning the constitutional issues at stake, or by making factual findings that must precede appellate review.
Id. at 294-95. This court agrees with the foregoing analysis and must, therefore, consider the effect of the exhaustion doctrine in this case.[1]
The requirement of exhaustion is generally not absolute, unless the legislature so mandates, but must be applied in each case with an understanding of its purposes and the particular administrative scheme involved. Aleknagik Natives, supra, 648 F.2d at 499 (citing McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969)). The courts have established exceptions to the exhaustion requirement, where the administrative remedy is inadequate, see American Federation *1291 of Government Employees, Local 1668 v. Dunn, 561 F.2d 1310, 1314 (9th Cir.1977), where pursuit of administrative remedies would be a futile gesture, see Pence v. Kleppe, 529 F.2d 135, 143 (9th Cir.1976), where irreparable injury will result unless immediate judicial review is permitted, Rhodes v. United States, 574 F.2d 1179, 1181 (5th Cir.1978), or where the administrative proceeding would be void, see Winterberger v. International Bhd. of Teamsters, Local 162, 558 F.2d 923, 925 (9th Cir.1977).
Although the law of exhaustion is less clear in this respect than one might wish, it appears that the exceptions to exhaustion would not apply to an exhaustion requirement that is a "statutorily specified jurisdictional prerequisite." Montgomery v. Rumsfeld, 572 F.2d 250, 252 (9th Cir.1978) (quoting Weinberger v. Salfi, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975)). Statutory exhaustion requirements "may call into play constitutional concerns of separation of powers, and failure to adhere to them necessarily defeats jurisdiction." Montgomery v. Rumsfeld, supra, 572 F.2d at 253. If Congress has expressly made federal court jurisdiction to review a claim subject to an exhaustion requirement, then an unexhausted claim must be dismissed.
If exhaustion is not a statutory condition of jurisdiction, however, then "application of the doctrine is in the sound discretion of the district court." Aleknagik Natives Ltd v. Andrus, supra, 648 F.2d at 500. A court should balance the interests of the agency in applying its expertise, correcting its own errors, making a proper record, enjoying appropriate independence of decision and maintaining an administrative process free from deliberate flouting against the interests of private parties in finding adequate redress for their grievances. After balancing these interests, the court may determine to dismiss the action, to remand to the agency while retaining jurisdiction, or to proceed to the merits. Montgomery v. Rumsfeld, supra, 572 F.2d at 253-54. The Montgomery and Aleknagik Natives courts did not make explicit the relationship between the well-recognized exceptions to exhaustion previously mentioned and the case-by-case balancing process, but the exceptions can properly be viewed as crystallizing the results of that balancing process under certain recurring factual patterns which have in common that the administrative remedy fails to provide adequate redress to the aggrieved party.
Thus, when faced with an unexhausted claim, a court must begin by asking whether exhaustion was a "statutorily specified jurisdictional prerequisite." If the answer is yes, the case must be dismissed. If not statutorily deprived of jurisdiction, the court then considers whether any of the recognized exceptions apply; if one does, the court proceeds to the merits. If no recognized exception applies, the court must then balance the relevant factors and make a considered judgment. In the instant case, we conclude that arbitration is not a jurisdictional prerequisite and that the "futility" exception applies, so that exhaustion will not be required.
Section 1401 of MPPAA mandates exhaustion of the arbitration remedy for claims that are within its scope  as we have determined Schulze's claim to be. Section 1401(a) speaks in clear and definite tones: "Any dispute ... shall be resolved through arbitration." (emphasis added). If no arbitration proceeding is initiated, "the amounts demanded by the plan sponsor ... shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection." 29 U.S.C. § 1401(b)(1).[2]
*1292 Arguably, this statutory language means that an employer must submit to arbitration any dispute regarding a plan sponsor's assessment and calculation of withdrawal liability in order to preserve his right to eventual judicial review.[3] However, a comparison between MPPAA and the provisions of the Social Security Act that were under consideration in Weinberger v. Salfi, supra, shows that Congress understands the difference between mandating exhaustion as the general rule, as it did in MPPAA, and making exhaustion the jurisdictional prerequisite of judicial review.
In Salfi, a three-judge district court had accepted jurisdiction under 28 U.S.C. § 1331 of a constitutional challenge to Social Security eligibility requirements governing duration of relationship for surviving wives and stepchildren of deceased wage earners, despite a provision of the Social Security Act which apparently deprived the district court of jurisdiction under 28 U.S.C. § 1331. That provision read as follows:
The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section [1331 et seq.] of Title 28 to recover on any claim arising under this subchapter.
42 U.S.C. § 405(h). The next preceding subsection provided for what judicial review is allowed under the Social Security Act:
Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain review of such decision by a civil action commenced within sixty days after the mailing to him of such decision .... Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.
42 U.S.C. § 405(g) (emphasis added).
The district court held that the jurisdictional limitation of section 405(h) was inapplicable because it amounted to no more than a codification of the doctrine of exhaustion of administrative remedies. The Supreme Court reversed, stating:
The District Court's reading of § 405(h) was, we think, entirely too narrow.
That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted. Moreover, if the third sentence is construed to be nothing more than a requirement of administrative exhaustion, it would be superfluous. This is because the first two sentences of § 405(h) ... assure that administrative exhaustion will be required.
422 U.S. at 757, 95 S.Ct. at 2463. After discussing the policies underlying the judicially-developed exhaustion doctrine, with particular reference to the Court's decision in McKart v. United States, supra, the Court added,

*1293 The present case, of course, is significantly different from McKart in that a "final decision" is a statutorily specified jurisdictional prerequisite. The requirement is, therefore, as we have previously noted, something more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility such as that made by the District Court here.
Id. at 766, 95 S.Ct. at 2467 (emphasis added).
Thus, the Salfi court employed the phrase "statutorily specified jurisdictional prerequisite" to describe a finality provision the jurisdictional effects of which could hardly have been made more explicit. In contrast, MPPAA contains nothing like the jurisdiction-limiting third sentence of section 405(h). In fact, section 1451(a) of MPPAA, the Act's grant of jurisdiction, is much more generous than section 405(g) of the Social Security Act. It provides:
(1) A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.
(2) Notwithstanding paragraph (1), this section does not authorize an action against the Secretary of the Treasury, the Secretary of Labor, or the corporation.
29 U.S.C. § 1451(a).
As the Social Security Act shows, Congress knows how to condition jurisdiction upon exhaustion. Congress also knows how to make such a jurisdictional prerequisite subject to exceptions for "extraordinary circumstances." See, e.g., 29 U.S.C. § 660(a) (judicial review of orders by Occupational Safety and Health Review Commission), discussed in Lloyd C. Lockrem, Inc. v. United States, 609 F.2d 940 (9th Cir.1979). Congress did not make arbitration a jurisdictional prerequisite in MPPAA. This does not mean, of course, that Congress intended to allow a deliberate flouting of the dispute resolution process that it established. Rather, a reasonable interpretation "of the particular administrative scheme involved," McKart v. United States, supra, 395 U.S. at 193, 89 S.Ct. at 1662, is that section 1401 codifies the judicial doctrine of exhaustion.
Where, as here, Congress has mandated a non-judicial remedy in the first instance, a court has a much narrower scope of action than where exhaustion is purely a matter of judicial policy, but the court is not automatically divested of jurisdiction. The exhaustion requirement should not be applied blindly or mechanically without regard to whether the policies of the doctrine are served by its application in a particular case. Aleknagik Natives Ltd. v. Andrus, supra, 648 F.2d at 499-500, but the court should exercise restraint in balancing the factors favoring and disfavoring exhaustion and give due deference to the congressional choice.
In Republic, supra, the Third Circuit approached the exhaustion issue under MPPAA in an appropriately cautious manner, saying,
If the statutory schema mandates exhaustion of an administrative remedy, and if that remedy is adequate in its furtherance of the policies behind the doctrine, then only in extraordinary circumstances, when the complaining party satisfies one of the narrow exceptions to the doctrine, should the court excuse exhaustion.
693 F.2d at 294. In Republic, the court held that the MPPAA arbitration procedure was an inadequate remedy for the plaintiff's facial constitutional challenge to the Act, since the arbitration could neither moot the constitutional issues nor develop a factual matrix for the later resolution of those issues by the judiciary. Id. at 297. Because it found the exhaustion doctrine inapplicable to the claim before it, the Republic court did not need to go further to consider whether the employer could invoke one of *1294 the narrow exceptions to the exhaustion doctrine. Id. at 298.
Here, the arbitration remedy is not inadequate as it was in Republic. An arbitrator could sustain Schulze's claim that it withdrew from the Plan prior to the Act's effective date and could rule that withdrawal liability had been improperly assessed. In the unusual circumstances of this case, however, resort to the arbitration remedy would be futile, because the court must determine the date of withdrawal independently and can do so as a matter of law.
The court must fix the date of Schulze's withdrawal in order to determine Schulze's liability, if any, for regular contributions that the Plan claims are owing for the period subsequent to the date Schulze claims to have withdrawn. Contribution liability does not fall within MPPAA's arbitral jurisdiction. The date of Schulze's withdrawal is, on the present record, a question of law. The statutory standard defines withdrawal in terms of the "obligation to contribute." 29 U.S.C. § 1381; see ante at 1289-1290.[4] The court finds that no issue of fact remains as to the date that Schulze ceased to have an obligation to contribute to the Plan. In reviewing an arbitral determination of Schulze's withdrawal liability, the court would owe no deference to the arbitrator's conclusions of law. If the arbitrator decided on a different withdrawal date, the court would have no choice but to reverse what in our view would be an erroneous decision of law.
If, contrary to what we have actually found to be the case, disputed issues of fact remained, precluding summary judgment for Schulze, it might be appropriate for the court to stay further proceedings on the contribution liability issue, and allow an arbitrator initially to resolve the factual dispute on the date of withdrawal. In the present posture of the case, however, arbitration has little to offer either the parties or the court. The policy factors which generally favor exhaustion are at a minimum in this case. There is no need for further development of the factual record, for the application of administrative expertise, or the exercise of administrative discretion. See McKart v. United States, supra, 395 U.S. at 194, 89 S.Ct. at 1664. The issue presented here requires an interpretation of a federal statute, the MPPAA, and an application of principles drawn from the body of federal labor law to facts that are essentially undisputed. Both requirements are more suitably met in a federal court than in arbitration.
In reaching the decision not to require exhaustion, the court has found it helpful to "peek" at the merits. While it may seem more logical to separate the questions completely and to determine whether the exhaustion doctrine allows the court to reach the merits before considering them, the factors that should influence the court's exhaustion decision are often bound up with the merits. The exhaustion doctrine is preeminently a practical one, the "underlying goal" of which is "the expeditious administration of justice." Montgomery v. Rumsfeld, supra, 572 F.2d at 253. It would be difficult to make an intelligent choice of the proper decisionmaker without some understanding *1295 of what the decision process in the particular case will entail.[5]
The decision to proceed to the merits of Schulze's applicability claim is not in any sense in derogation of the dispute resolution process created by Congress in MPPAA. Where Congress has required exhaustion as the general rule, it presumably intended the exceptions to remain just that  exceptions, to be invoked only in extraordinary circumstances. See Republic, supra, 693 F.2d at 294. Because the circumstances before us  the coincidence of arbitrable and non-arbitrable issues and the absence of any genuine factual dispute  are indeed extraordinary, we are confident that our decision will not undermine the exhaustion policies embodied in MPPAA.

B. Cessation of Obligation to Contribute
As previously noted, the date of Schulze's withdrawal from the Plan is the date that it ceased permanently to have an obligation to contribute to the Plan. 29 U.S.C. § 1383. It is undisputed that Schulze's obligation under its collective bargaining agreement with the IAM ceased no later than the expiration date of the one agreed-upon extension on April 14, 1980. The only question is whether Schulze's obligation to contribute continued after that date "as a result of a duty under applicable labor-management relations law." Id.
Upon expiration of a collective bargaining agreement, an employer is not immediately free to change wages, benefits, and working conditions. As the Ninth Circuit has written:
[T]he collective bargaining agreement itself survives its expiration date for some purposes. During negotiations, the employer is required by section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) (1976), to maintain the status quo as to wages and working conditions, even following the expiration date of the agreement.
Peerless Roofing Co., Ltd. v. NLRB, 641 F.2d 734, 736 (9th Cir.1981). When the employer and the union have bargained to impasse, the employer is then free to institute unilateral changes in terms and conditions of employment that were reasonably comprehended by the employer's pre-impasse bargaining proposals. Clear Pine Mouldings, Inc. v. NLRB, 632 F.2d 721, 729 (9th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981); NLRB v. Skywolf Sales, 470 F.2d 827, 830 (9th Cir. 1972). If Schulze and the union were at impasse on April 15, 1980, if Schulze then implemented its own pension plan and ceased contributing to the IAM Plan, and if there was no other source of duty requiring Schulze to continue making contributions, then Schulze "ceased to have an obligation to contribute," i.e. withdrew from the Plan as of that date.
The Plan argues that the termination of Schulze's obligation under the Plan is determined by statute and does not depend solely on the existence of an impasse in collective bargaining. The Plan alludes to what it terms "the critical and controlling provision of MPPAA":
Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because 
. . . . .
(2) an employer suspends contributions under the plan during a labor dispute involving its employees.
29 U.S.C. § 1398. This provision by its terms applies only to a suspension  a temporary interruption  because of a labor dispute; it is evidently intended to prevent the risk of withdrawal liability from influencing labor-management negotiations when the employer has no intention of permanently withdrawing from the plan. The *1296 provision does not pertain to a permanent termination such as Schulze's.
The Plan further argues that ERISA does not refer to or incorporate the NLRA, under which the impasse concept developed. This ignores the most obvious meaning to be given the statutory phrase "obligation to contribute arising  ... (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a), nor does the Plan attempt to explain what other duty Congress may have intended to incorporate by this reference.
Absent any suggestion of a separate or additional duty to contribute imposed by law, the court concludes that if Schulze reached impasse in its negotiations with the IAM and took definite steps to implement its prior position that it would no longer participate in the Plan, then at that point it permanently ceased to have an obligation to contribute to the Plan and, therefore, withdrew. The remaining question for discussion is whether there is any issue of fact with respect to the existence of an impasse on April 15, 1980.

C. Appropriateness of Summary Judgment Under the Impasse Standard
The concept of impasse in labor-management relations law has developed through decisions of both the NLRB and the courts of appeals. A recent Ninth Circuit summary of the doctrine stated:
A bargaining impasse has been described as a situation where the "members could well conclude that `there was no realistic prospect that continuation of discussion at that time would have been fruitful.'" A number of relevant criteria have been identified in determining whether an impasse exists. The NLRB has recognized a number of these criteria: Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed.
H & D, Inc. v. NLRB, 665 F.2d 257, 259-60 (9th Cir.1980), rev'd on other grds., 455 U.S. 902, 102 S.Ct. 1243, 71 L.Ed.2d 440 (1982) (citations omitted). The Plan points to subjective criteria such as "contemporaneous understanding" to buttress its position that summary judgment should not be granted. But if undisputed evidence in the record would require a finding that "there was no realistic prospect that continuation of discussion at that time would have been fruitful," id., then summary judgment is appropriate. British Airways Bd. v. Boeing Co., 585 F.2d 946, 950-51 (9th Cir.1978), cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Since the Plan does not put in issue any of the facts produced by Schulze, the only question is whether these facts are sufficient to meet Schulze's burden on summary judgment.
The presentation and rejection of a final offer is a good indication of impasse. In Excavation-Construction, Inc. v. NLRB, 660 F.2d 1015, 1019-20 (4th Cir.1981), the employer had unilaterally imposed a policy of no overtime pay on Saturday unless the hours worked were in excess of 40 for the week. The NLRB found the employer guilty of refusal to bargain, an unfair labor practice. The court reversed, finding that an impasse existed: "The company had made its last and final offer which the union had voted to reject. At that point, it cannot be said that there was a realistic possibility that negotiations would be fruitful." Id. In the present case, of course, the employer also made a final offer, at the union's request, which was voted down by the members who then went on strike.
The fact that progress had been made on some issues and that Schulze had shown flexibility on the pension issue does not necessarily indicate the absence of impasse. In NLRB v. Yama Woodcraft, Inc., 580 F.2d 942 (9th Cir.1978), after lengthy negotiations in which some early progress had been made on non-economic issues, the employer rejected the union's economic proposal and withdrew its own from the table. The parties *1297 were unable to come together on economic issues. A strike ensued and the employer put its last wage proposal into effect. The NLRB found an impasse on economic issues, but no impasse in the negotiations as a whole because of progress on other issues. Thus, it held the employer guilty of an unfair labor practice. The court reversed, saying,
[This] is a case in which the bargaining positions of both parties produced a bona fide impasse on economic issues which would not have been broken by discussions of secondary non-economic issues. For as the court observed in American Fed. of Television & Radio Artists v. NLRB, 395 F.2d 622, 627 n. 13 (D.C.Cir. 1968): "It cannot be doubted that a deadlock on one critical issue can create as impassable a situation as an inability to agree on several or all issues." Given the centrality of economic issues to both parties, it is apparent that once impasse had been reached on those issues, there was "no realistic possibility that continuation of discussion at that time would have been fruitful."
Id. at 944-45 (citation omitted). In the present case, Schulze's 75 percent production worker wage rate was a central issue on which the parties deadlocked from the very outset of negotiations.
The fact that meetings took place after the strike started did not reflect flexibility in either party's position. In H & D, Inc. v. NLRB, supra, negotiations began one month before the expiration date of the old agreement and continued for three months until H & D withdrew from the multiemployer negotiations. Despite these continuing negotiations, the court stated that,
The record manifests a continuing disagreement of [sic] the central issue of the economic aspects of the contract, i.e. wages, health and pension benefits. The administrative law judge indicated in his opinion that "the parties had been `deadlocked' on monetary proposals since shortly after negotiations for a new contract had begun and still continued as of the date this trial commenced on August 18." 665 F.2d at 260. Despite what appear to have been cosmetic changes in Schulze's position after the strike started, the parties were deadlocked over Schulze's demand for a two-tier wage scale from at least April 15 on. It is not necessary to our decision, however, that the impasse continued on past April, since it is Schulze's actions prior to the effective date of MPPAA that are critical here. See NLRB v. Hi-way Bill-boards, Inc., 473 F.2d 649 (5th Cir.1973) (impasse existed at time employer withdrew from multiemployer bargaining association, even though agreement was reached shortly thereafter).
The Plan argues that the record is inadequate to permit summary judgment on the issue of impasse, because only one side's story of the negotiations is before the court. We need not speculate on what the union negotiators might have said to create a dispute of fact, for the Plan has had a more than ample opportunity to develop this evidence, and its failure to do so supports the inference that no such evidence exists.
Schulze first gave the Plan notice of its claim that an impasse had existed on April 15, 1980 in Thesing's letter of October 8, 1981 to Roger Hunt, an attorney for the Plan. By December 22, 1981, it was clear that there would be litigation over Schulze's claim that it had withdrawn from the Plan prior to April 29, 1980. The instant motion was initially filed on November 12, 1982. The Plan's first opposition memorandum was filed on November 29, 1982. Hearing on the motion was delayed, and the Plan filed a supplemental brief on January 20, 1983. At no time has the Plan offered counter-declarations to put in issue the evidentiary matter offered by Schulze.
Where the moving party on summary judgment has met its burden, the opposing party must present specific facts to show that contradiction of movant's evidence is possible. British Airways Bd. v. Boeing Co., supra, 585 F.2d at 951. The Plan has failed to meet this burden. Schulze is entitled to summary judgment on the basis that its obligation to contribute to the Plan permanently ceased on April 15, 1980, at which *1298 point in time an impasse existed and Schulze lawfully ceased making contributions to the Plan and began implementing its own pension plan.
SO ORDERED.
NOTES
[1] The differences between a determination by an administrative agency and one by a privately-selected arbitrator might be material to the application of the exhaustion doctrine in some circumstances, but here the court's analysis would be no different if the unexhausted remedy lay with an agency rather than an arbitrator.
[2] Once a dispute has been arbitrated, the statute provides for judicial review: "[A]ny party thereto may bring an action, no later than 30 days after the issuance of the arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). In a post-arbitral court proceeding, the arbitrator's findings of fact, though not his conclusions of law, carry a presumption of correctness that is rebuttable only by a "clear preponderance" of the evidence. Id. § 1401(c).
[3] It is possible to read § 1401(b) as providing the employer with a choice: To submit the dispute to arbitration and thereafter seek review under § 1401(b)(2), or, alternatively, to forgo arbitration and to raise any defenses the employer may have in the plan sponsor's collection action under § 1401(b)(1). By making arbitration elective for the employer, this interpretation would nullify Congress's choice of a speedy and less formal procedure for at least the initial phase of withdrawal liability assessment and collection. In our view, any claims that might have been pursued in an arbitration proceeding could not be raised as defenses to an action under § 1401(b)(1).
[4] It is true that the definition of obligation to contribute in § 1392 states that the definition is "[f]or purposes of this part," evidently referring to Part 1  "Employer Withdrawals," which is only one of three parts of Subtitle E, "Special Provisions for Multiemployer Plans," which embraces most of the sections added by MPPAA. No other definition of "obligation to contribute" is found anywhere in ERISA, however. There is no reason to believe that Congress intended to create any discontinuity between the employer withdrawal part of the Act and other contexts in which the question of obligation to contribute might arise. Moreover, the definition contained in section 1392 is a common sense description  an obligation arising under one or more collective bargaining agreements or as a result of a duty under applicable labor law. It is not a narrowly technical term of art peculiarly related to withdrawal liability. The court has concluded, therefore, that the date that Schulze's obligation to contribute to the Plan ceased is the same for purposes of determining liability for contributions as it is for fixing Schulze's withdrawal date under MPPAA.
[5] Professor Davis suggests that in making exhaustion decisions courts often consider the merits sub silentio, but yield to the apparent logic of treating exhaustion as completely separate and prior to the merits by failing to give the true reasons for their decisions. The result, in his view, is that "[j]udicial action on exhaustion problems is much superior to judicial opinions on exhaustion problems." 4 K. Davis, Administrative Law Treatise, § 26:2 at 420 (2d ed. 1983). He recommends that courts give themselves full freedom to get an impression of the merits and to acknowledge openly that they do so. Id.