CUYAMACA MEATS, INC., a California corporation; C & M Meat Packing Corp., a California corporation; National Meat Packers, Inc., a California corporation, Plaintiffs,

v.

SAN DIEGO AND IMPERIAL COUNTIES BUTCHERS' AND FOOD EMPLOYERS' PENSION TRUST FUND, an unincorporated association, Defendant.

SAN DIEGO AND IMPERIAL COUNTIES BUTCHERS' AND FOOD EMPLOYERS' PENSION TRUST FUND, an unincorporated association, Counter-claimant,

v.

CUYAMACA MEATS, INC., a California corporation; C & M Meat Packing Corp., a California corporation; National Meat Packers, Inc., a California corporation, Counter-defendants.

No. 84–1169–B(CM).

United States District Court, S.D. California.

June 26, 1986.

Harry L. Stang, Lynn K. Thompson, Musick, Peeler & Garrett, Los Angeles, Cal., for plaintiffs and counter-defendant.

Richard D. Prochazka, San Diego, Cal., for defendant and counter-claimant.

BREWSTER, District Judge.

Plaintiffs and counter-defendants, Cuyamaca Meats, Inc., C & M Packing Corp., and National Meat Packers, Inc., ("the Employers"), filed this suit for declaratory judgment on May 1, 1984. Defendant and counter-claimant, San Diego and Imperial Counties Butchers' and Food Employers' Pension Trust Fund ("the Trust Fund"), counter-claimed for declaratory relief on May 22, 1984. Both sides seek a determination of the date the Employers permanently withdrew from the Trust Fund for purposes of ascertaining the amount of the Employers' withdrawal liability under the Multi-employer Pension Plan Amendments Act of 1980 ("the MPPAA").

These cross-motions for summary judgment came on for hearing on April 7, 1986.

At the hearing, the Court announced its decision to grant summary judgment for the Employers. The court now enters this Opinion and Order.

## I. BACKGROUND

### A. *Relevant Provisions of the MPPAA.*

Under the MPPAA, an employer becomes liable for withdrawal liability upon a complete or partial withdrawal from a multi-employer plan. 29 U.S.C. § 1381(a). A "complete withdrawal" occurs when an employer either "(1) permanently ceases to have an obligation to contribute under the plan or (2) permanently ceases all covered operations under the plan". *Id.* § 1383(a).[1] An "obligation to contribute" is defined as "an obligation to contribute arising—(1) under one or more collective bargaining (or related) agreements or (2) as a result of a duty under applicable labor-management relations law...." *Id.* § 1392(a).

Pursuant to 29 U.S.C. section 1391, each employer's withdrawal liability is calculated at the end of the pension fund's fiscal year or "plan year" and applies to any withdrawal occurring during the following twelve months. In rough terms, an employer's withdrawal liability is its proportionate share of the subtraction of the market value of the fund's assets from the fund's total benefit liability. During the period relevant to this litigation, the Trust Fund's plan year ended on June 30.

### B. *Facts.*

The parties are agreed on the events that gave rise to this lawsuit.

Each of the Employers was party to an identical collective bargaining agreement ("CBA") with Local 229A of the United Food and Commercial Workers Union ("Local 229A") that ran from October 1, 1979, through March 31, 1983. In the CBA, the Employers agreed to accept the terms of and to become a party to the Trust Agreement establishing the Trust Fund, and further agreed to contribute monthly to the Trust Fund specified sums based on hours

---

1. The parties are agreed that this case does not involve a "partial withdrawal".

worked by employees represented by Local 229A.

Negotiations for a new CBA began on March 28, 1983. On March 31, 1983, the CBA negotiated in 1979 expired. The Employers continued to make contributions to the Trust Fund in accordance with the terms of the 1979 CBA. On April 22, 1983, each of the Employers presented an identical comprehensive written offer to Local 229A, termed a "final offer". With respect to pensions, Article XVIII of the final offer proposed establishing and contributing to individual retirement accounts for employees. Implicit in that proposal was that the Employers would cease contributing to the Trust Fund.

On April 29, 1983, the Trust Fund's attorney wrote a letter to the Employers' attorney, Harry Stang, in response to Stang's request. The letter informed Stang that the market value of the Trust Fund's assets had increased significantly since the end of the last plan year on June 30, 1982. The letter stated that, as a result, if the plan year had ended on March 31, 1983,[2] the total withdrawal liability would have declined by almost one million dollars from the June 30, 1982, figure.

On May 2, 1983, Local 229A notified the employers by telegram that the April 22 "final offer" had been rejected by the union membership. In the telegram, the union also requested additional negotiations, stating "we are not at impasse".

The next negotiating session was held on May 5, 1983. At this meeting, the Employers revised their "final offer" of April 22, 1983, with respect to retirement only, as follows:

Amend Section XVIII,
*Retirement,* to provide:

1. The Company shall continue its present pension plan through August 31, 1983, which shall be subject to an eligibility requirement of twelve (12) months' continuous service.

2. The plan set forth in Section XVIII of the Companies' April 22, 1983, propos-

al shall become effective September 1, 1983.

The parties could not reach agreement. On May 23, 1983, the Employers notified the union that an impasse existed. On May 24, 1983, the Employers implemented the economic terms of their April 22 final offer as modified on May 5. Accordingly, with respect to pensions, the proposal implemented by the Employers was that they would contribute to the Trust Fund through August 31, 1983. The Employers tendered contributions through August 31, 1983, but the Trust Fund refused to accept them from and after May 23, 1983.

On June 8, Local 229A began a strike and picketing against the Employers. On June 28, Local 229A filed an unfair labor practices charge against the Employers with the National Labor Relations Board ("NLRB"). The union contended that no bona fide impasse existed on May 24, 1983, to privilege the Employers to implement their last offer. On August 11, the NLRB Regional Director dismissed the charges, and on October 31, the NLRB Office of Appeals upheld the dismissals, stating that a genuine impasse had in fact occurred by May 24.

On September 30, 1983, the Trust Fund sent a letter to each of the Employers, stating that the Trust Fund had determined that they had ceased to have an obligation to contribute to the Trust Fund as of May 23, because of an impasse on that date. In those letters, the Trust Fund claimed that the Employers were indebted to the Fund for unfunded vested benefit withdrawal liability in the following amounts:

| | |
|---|---|
| Cuyamaca Meats | $279,750.08 |
| C & M Meat Packing | 428,329.46 |
| National Meat Packing | 146,127.28 |

The Trust Fund has not attempted to collect the withdrawal assessments during the pendency of this litigation.

In February, 1984, the Employers learned precisely what their liability would be if withdrawal occurred on September 1, 1983. An actuarial report showed that the

---

**2.** In fact, as noted above, the plan year would not end until June 30, 1983.

Trust Fund's unfunded liability for the plan year ending June 30, 1983, was only $306,-200 compared to $2,541,000 for the plan year ending June 30, 1982. Thus, assuming the Employers withdrew on September 1, 1983 (or any date after June 30, 1983), their respective withdrawal liabilities would be as follows:

| | |
|---|---|
| Cuyamaca Meats | $ 38,213.76 |
| C & M Meat Packing | 48,226.50 |
| National Meat Packing | 14,881.32 |

## II. DISCUSSION

### A. *MPPAA Issues.*

The Employers withdrew from the Trust Fund when they "permanently cease[d] to have an obligation to contribute under the plan". 29 U.S.C. § 1383(a)(1). Section 1392(a) defines "obligation to contribute" as an obligation arising (1) under a collective bargaining or related agreement or (2) "as a result of a duty under applicable labor-management relations law". The 1979 CBA expired on March 31, 1983. After that date, the Employers' obligation to contribute, if any, arose under (1) an agreement related to the CBA or (2) duties imposed by applicable labor relations law. The latter duties include those imposed by the National Labor Relations Act (NLRA). *See I.A.M. National Pension Fund v. Schulze Tool and Die Co.,* 564 F.Supp. 1285, 1295–96 (N.D.Cal.1983) (hereinafter *Schulze* ).

The Trust Fund premises its argument that the Employers withdrew on May 23, 1983, on language from *Schulze* to the effect that, once impasse was reached and the employer

> took definite steps to implement its prior position that it would no longer participate in the Plan, then at that point it permanently ceased to have an obligation to contribute to the Plan and, therefore, withdrew.

*Id.* at 1296.

■ *Schulze* does not support the Trust Fund's position. As *Schulze* explained, section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5), imposes a duty to bargain in good faith on employers and unions. The duty to bargain in good faith requires that, during negotiations, the employer maintain the status quo as to wages and working conditions, even following the expiration date of the agreement. *Peerless Roofing Co., Ltd. v. NLRB,* 641 F.2d 734, 736 (9th Cir.1981). When the employer and the union have bargained to impasse, the employer is then privileged to institute unilateral changes in terms and conditions of employment that were reasonably comprehended by the employer's preimpasse bargaining proposals. *Id.* at 735.

In *Schulze,* upon impasse, the employer elected to implement his pre-impasse proposal to stop contributing to the pension plan. In the present case, the Employers elected to implement their amended final offer of May 5 to continue contributing to the Trust Fund through August 31, 1983. The quoted language in *Schulze* does not apply here because the Employers chose not to implement their April 22 offer to cease contributing to the Trust Fund, instead choosing to implement their May 5 offer.

■ The Trust Fund contends that the Employers' obligation to contribute ended on May 23, 1983, because upon impasse, the Employers had the option to stop contributing in accordance with their April 22 offer. The Court disagrees with this reasoning. Once the Employers exercised their privilege to implement their May 5 offer, they assumed an obligation to continue contributing through August 31, because of the effect on third parties of the commitment to contribute to the Trust Fund. The Employers reasonably should have expected their promise to induce justifiable reliance by the employees who were to benefit from it. As a result, if the Employers had not performed their promise, any employees who detrimentally changed their position in reliance on it could be entitled to its enforcement under the doctrine of promissory estoppel. *See* 1 B. Witkin, Summary of California Law §§ 189–90 (8th ed. 1973). Promissory estoppel can be a substitute for considera-

tion. *Id.* Under these circumstances, the Court is of the opinion that the Employers' promise to continue contributing through September 1, 1983, gave rise to an enforceable agreement. This agreement was related to the CBA since, with only a minor modification,[3] it duplicated the CBA's provision with respect to retirement. The Court therefore holds that, by electing to implement their May 5 offer, the Employers incurred an obligation arising under an agreement related to the CBA, for purposes of the application of section 1392(a)(1).

In the alternative, the Court holds that the Employers' election to continue contributing created an obligation arising under duties imposed by the NLRA, pursuant to section 1392(a)(2). The Employers elected to continue contributing pursuant to their well-established NLRA right, upon impasse, to make unilateral changes that were reasonably comprehended by their pre-impasse proposals. *See, e.g., NLRB v. Katz,* 369 U.S. 736, 745, 82 S.Ct. 1107, 1112, 8 L.Ed.2d 230 (1962); *Peerless Roofing, supra; American Federation of Television and Radio Artists v. NLRB,* 395 F.2d 622, 624 (D.C.Cir.1963). Having pursued that right, the Employers were obligated to contribute through August 31, as explained above, under the doctrine of promissory estoppel.

This reading of section 1392(a) averts a possible conflict between that provision and the rights of employers upon impasse established by NLRA case law. The Court is loathe to interpret section 1392(a) in such a manner as would revoke the Employer's privilege to implement preimpasse proposals, especially since the NLRA case law was well-settled at the time of the enactment of the MPPAA in 1980. This would be the precise result of adopting the Trust Fund's position. Under the interpretation advanced by the Trust Fund, a pension fund could thwart an employer's election to implement a pre-impasse proposal to continue contributing by refusing to accept con-

tributions after the date of impasse. Obviously, the employer's privilege to implement pre-impasse proposals would be meaningless if not given effect by the Court. The interpretation of section 1392(a) enunciated in this opinion preserves the employer's option under the NLRA to implement pre-impasse proposals and does so in a manner consistent with section 1392(a)'s function of fixing a date for the calculation of withdrawal liability.

The Trust Fund additionally argues that 29 U.S.C. section 1392(c) requires that the Court ignore the May 5 offer. Section 1392(c) provides:

> If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

The Employers concede that one of the purposes of the May 5 offer was to minimize the Employers' withdrawal liability by making them liable only for their share of unfunded liability for the plan year ended June 30, 1983. The parties dispute whether this was a "principal purpose" of the proposal.

Even assuming a principal purpose was to reduce withdrawal liability, the legislative history of section 1392(c), sparse as it appears to be, indicates that this proposal was not a transaction that Congress intended the provision to cover. Representative Frank Thompson stated during House debates:

> ... the bill provides that transactions undertaken to evade or avoid withdrawal liability may not be used as a method of escaping withdrawal liability that would otherwise be imposed. It is intended that the plan sponsor, the arbitrator, and the courts follow the substance rather than the form of such transactions in determining, assessing, and collecting withdrawal liability.

．　　．　　．　　．　　．

---

**3.** The May 5 proposal added an eligibility requirement—that employees must have provided twelve months of continuous service—that was not present in the 1979 CBA.

Furthermore, we intend that the term "employer" be construed in a manner consistent with the bill and its purposes. We intend that employers not be able to evade or avoid withdrawal liability through changes in identity, form, or control, or through transactions which are less than bona fide and arm's length. Hence, for example, a building and construction industry employer—or for that matter any employer contributing to a plan—will not be able to evade withdrawal liability by going out of business and resuming business under a different identity.

126 Cong.Rec. 23038 (1980). This statement suggests that section 1392(c) was directed at essentially fraudulent maneuvers lacking in economic substance.

The May 5 offer was neither fraudulent nor without economic substance. It was made during arm's length bargaining for a new collective bargaining agreement. From the union's standpoint, the May 5 offer undoubtedly constituted an improvement over the previous offer to terminate contributions to the Trust Fund immediately.

■ Furthermore, the Employers were not attempting to "evade" or "avoid" withdrawal liability. At most, they were trying to minimize withdrawal liability by planning their withdrawal to occur at a time when they believed they would benefit from an increase in the market value of the Trust Fund's assets. The Court concludes that Congress did not intend section 1392(c) to apply to employer proposals made during negotiations toward a collective bargaining agreement which are motivated, at least in part, by a desire to minimize withdrawal liability.[4]

### B. Section 302(c)(5).

The Trust Fund argues in the alternative that section 302(c)(5) of the Labor-Manage-

ment Relations Act, 29 U.S.C. § 186(c)(5), dictates that withdrawal occurred on May 23, 1983. Specifically, the Trust Fund argues that that statute prohibited it from accepting employer contributions after that date.

The Ninth Circuit described the purpose of section 302 in *NLRB v. United Brotherhood of Carpenters & Joiners*, 531 F.2d 424, 427 (9th Cir.1976), as follows:

Section 302 was intended to regulate payments by employers to employee representatives, and was aimed at forestalling practices Congress considered injurious to the collective bargaining process such as bribery of employee representatives by employers, extortion by employee representatives, and the potential abuse of power by union officials armed with sole control of welfare funds. (citing *Arroyo v. United States*, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959)).

Because of these concerns, section 302 generally prohibits payments by employers to employee representatives. However, section 302(c)(5) provides an exception for contributions to a trust fund established "for the sole and exclusive benefit of the employees of such employer, and their families and dependents ... *Provided* That, ... (B) the detailed written basis on which said payments are to be made is specified in a written agreement with the employer...." 29 U.S.C. § 186(c)(5)(B).

The Trust Fund contends that, as of the date of impasse, there was no longer a written agreement setting forth the basis of the payments to the Trust Fund. The Trust Fund relies on *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969). There, the Second Circuit held that a trust fund could not accept contributions

---

**4.** While the Trust Fund argues that the Employers attempted to evade withdrawal liability, the Employers, not without reason, charge that the Trust Fund is seeking a windfall payment, given the significant increase in the value of the Trust Fund's assets during its plan year ending June 30, 1983. It is clear that both sides have been

motivated by a desire to maximize their economic position. The Court does not consider such possible motivation, if true, by either side to be determinative. Instead, as explained above, the holding is based on an effort to harmonize the NLRA case law with section 1392(a) of the MPPAA.

for and pay benefits to an employee when the employer never signed a written agreement specifying the basis of the payments into the Trust Fund.

*Moglia* is distinguishable from the present case. Here, the basis of the contributions was detailed in the expired CBA. The written agreement requirement of section 302(c)(5) is satisfied by an expired CBA when an employer continues to make contributions pursuant to the CBA while negotiations for a new CBA are continuing, since the employer is required to do so under the duty to bargain in good faith. *See, e.g., Producers Dairy Delivery Co. v. Western Conference of Teamsters Pension Trust Fund,* 654 F.2d 625, 627 (9th Cir.1981), *Peerless Roofing Co. v. NLRB,* 641 F.2d 734, 736 (9th Cir.1981) (distinguishing *Moglia*). In *Carter v. CMTA-Molders & Allied Health and Welfare Trust,* 736 F.2d 1310, 1312–13 (9th Cir. 1984), the Ninth Circuit held the written agreement requirement was satisfied where an employer who, upon purchasing his predecessor's business, allowed the CBA to expire but continued to make payments in accordance with the expired CBA for five and one-half years.

■ The fact that an impasse was reached prior to the Trust Fund's refusal to accept the Employers' payments does not preclude the CBA from satisfying the written agreement requirement. As discussed above, the Employers obligated themselves to adhere to the terms of the May 5 offer when they elected to continue contributing upon impasse. That offer provided that the Employers "shall continue [the] present pension plan through August 31, 1983, which shall be subject to an eligibility requirement of twelve months' continuous service". Although this offer added a new eligibility requirement, it nevertheless provided that payments were to be made in accordance with the provisions of the expired CBA. The detailed basis for the payments was thus set out in the expired CBA. Accordingly, section 302(c)(5) did not bar the Employers from continuing to make the payments nor did it bar the Trust Fund from accepting them.

C. *Attorney's Fees.*

The Employers included in their motion a request for attorney's fees, pursuant to 29 U.S.C. § 1451(e), which provides:

In any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party.

Plaintiffs may seek an award of attorney's fees by separate motion in which the issue is fully briefed and a detailed fee application is provided.

## ORDER

(1) The Employers' motion for summary judgment is GRANTED, and the Trust Fund's cross-motion for summary judgment is DENIED.

(2) Judgment shall be entered for the plaintiffs, Cuyamaca Meats, Inc., C & M Meat Packing Corp., and National Meat Packers, Inc.:

(a) Declaring that the plaintiffs withdrew from the defendant Trust Fund on September 1, 1983;

(b) Dismissing the counter-claim filed by the Trust Fund;

(c) Awarding plaintiffs their costs of suit, pursuant to Local Rule 265, plus any reasonable attorney's fees to which plaintiffs may be found entitled.