T.I.M.E.–DC, INC., Plaintiff,

v.

NEW YORK STATE TEAMSTERS CON-
FERENCE PENSION & RETIRE-
MENT FUND, Defendant.

No. 83–CV–766.

United States District Court,
N.D. New York.

Feb. 15, 1984.

Proskauer, Rose, Goetz & Mendelsohn, New York City, Kirkland & Ellis, Washington, D.C., for plaintiff; Bettina B. Plevan, New York City, Carl L. Taylor, Donald

E. Scott, Nancy E. Hollingsworth, Washington, D.C., of counsel.

Maloney, Viviani & Higgins, New York City, for defendant; Arthur J. Viviani, New York City, of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action, seeking injunctive and declaratory relief against the threat of prosecution, enforcement, or collection by defendants of certain sums of money allegedly due as "withdrawal liability" under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1405 (West Supp.1976–1982), arises out of a labor dispute which began on April 1, 1982. Jurisdiction is predicated upon 28 U.S.C. § 1331 and 29 U.S.C. § 1451(c) (West Supp.1976–1982). Before this Court is plaintiff's motion for a preliminary injunction, Fed.R.Civ.P. 65.[1]

### II

Plaintiff T.I.M.E.–DC, Inc. ("TIME–DC"), is an interstate motor carrier of freight and has operated nationwide under union contracts with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters" or "union"). Defendant New York State Teamsters Conference Pension and Retirement Fund ("Fund") is an employee benefit fund that is maintained pursuant to a collective bargaining agreement and a declaration of trust between contributing employers and various local unions of the Teamsters. The Fund is a multiemployer fund within the meaning of ERISA, 29 U.S.C. §§ 1002(37)(A), 1301(a)(3), and is one of twenty-seven such Teamsters multiemployer pension funds covering different regions of the United States. Under the terms of the collective bargaining agreement, TIME–DC has contributed to the Fund based on time worked by union employees.

Since 1952, TIME–DC has conducted its trucking operations under union contracts with the Teamsters. The latest collective bargaining agreement between these parties was the National Master Freight Agreement covering the period from April 1, 1979 to March 31, 1982. That agreement had been negotiated between the Teamsters National Freight Industry Negotiating Committee and Trucking Management, Inc. ("TMI"), an association of carriers.

Beginning in the late 1970's, TIME–DC's business began to deteriorate, primarily due to increased competition from non-union firms and the 1978 deregulation of the trucking industry. Responding to the threat posed by this new competition, and realizing that its prospects for continued profitability depended on its ability to compete effectively with non-union carriers, TIME–DC decided to bargain with the Teamsters on an individual basis. Accordingly, in September of 1981, TIME–DC withdrew from the multiemployer bargaining carried on between TMI and the Teamsters. TIME–DC's efforts to negotiate a new contract proved unsuccessful, however, and the Teamsters instructed its membership to strike TIME–DC as of April 1, 1982. The strike, reinforced by picketing, closed TIME–DC's terminals across the United States, including three of its four upstate New York terminals. Teamsters at TIME–DC's Syracuse terminal, employed as local pick-up and delivery drivers, came to work on April 1st in defiance of the union's strike instructions, and continued to work until the terminal ran out of freight to be delivered. Ultimately, the

---

**1.** On June 24, 1983, this Court issued a temporary restraining order, Fed.R.Civ.P. 65(b), enjoining defendants "from taking any action to enforce the withdrawal liability provisions of 29 U.S.C. §§ 1381–1405 against plaintiff" pending determination of the present motion for a preliminary injunction. On September 23, 1983, immediately following the hearing held in the instant action, the parties stipulated to an extension of the temporary restraining order until this Court rendered its decision on the preliminary injunction. The final submissions of counsel were received by the Court on December 2, 1983.

Syracuse terminal was closed as well, and TIME–DC laid off the remaining drivers. During the strike, TIME–DC suspended its contributions to the Fund.

In August of 1982, the Teamsters made an unconditional offer to return to work. TIME–DC accepted that offer subject to a no-strike commitment for a period equal to the length of the strike to date. On November 23, 1982, TIME–DC informed the Teamsters National Negotiating Committee that it would resume operations. On December 1, 1982, TIME–DC publicly announced the end of the strike and its intention to gradually resume its operations. In March of 1983, the Teamsters and TIME–DC commenced negotiations toward a new agreement. Negotiations continued through April 15, 1983, when the Teamsters notified TIME–DC that they would be in touch in the near future but that their no-strike commitment would expire on April 26th. The parties met again on August 30, 1983 to discuss various contract proposals. At the conclusion of that meeting, the Teamsters' lead negotiator advised TIME–DC that he was giving notice pursuant to his April 15th letter that the Teamsters might resume their strike at any time. The next bargaining session was then scheduled for September 26th.

It is against this background that the predicate for the instant action developed. On April 13, 1982, the Fund sent TIME–DC a notice of MPPAA withdrawal liability.[2] This "alert" letter was not the statutorily required notice and demand for payment of withdrawal liability under 29 U.S.C. § 1399(b)(1).[3] Apparently, this letter was prompted both by what the Fund thought to be late contributions and its knowledge of the strike which closed down TIME–DC's operations. On April 21, 1982,

TIME–DC responded to the alert letter, noting:

> The effect that this strike will have on future pension contributions cannot be determined until the strike is over and the labor dispute has ended. Even if the strike causes a suspension of contributions, it is our understanding that a strike does not cause a withdrawal from a pension plan while the labor dispute continues.

(Plaintiff's exhibit 26). The Fund replied on April 28, 1982, acknowledging that its April 13th notice was merely an alert letter and stating that cessation of contributions triggered withdrawal liability regardless of the reason for cessation. (Plaintiff's exhibit 27). By letter dated May 5, 1982, TIME–DC informed the Fund of the labor dispute provision of the MPPAA:

> All laws, unfortunately, are subject to hours and days of interpretation. In this regard, may we direct your attention to ERISA Sec. 4218, which suggests that withdrawal will not occur because of suspension of contributions during a labor dispute. The International Brotherhood of Teamsters would be hard put to deny that it did strike this employer during the early hours of April 1, 1982, and continues to strike the Company. The continuing strike has effectively caused the cessation of the majority of the Company's operations. Therefore, should we temporarily cease contributing to the Fund, it will be for the obvious reason of the continuing strike by the I.B. of T.

(Plaintiff's exhibit 28 at 3). The Fund responded again on May 13, 1982, indicating that it would stop pursuing withdrawal liability only when TIME–DC actually resumed making contributions to the Fund. (Plaintiff's exhibit 28 at 1–2).

> As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall—
> (A) notify the employer of—
> (i) the amount of the liability, and
> (ii) the schedule for liability payments, and
> (B) demand payment in accordance with the schedule.

---

**2.** 29 U.S.C. § 1381(a) provides in relevant part:
> If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability ....

**3.** 29 U.S.C. § 1399(b)(1) provides:

In January of 1983, Alphonse Sgaglione, Executive Administrator of the Fund received from the Fund's actuary a calculation of withdrawal liability in the amount of $265,423. Based on this assessment, Sgaglione forwarded to TIME–DC the statutorily required notification of withdrawal liability, 29 U.S.C. § 1399(b)(1). By letter dated February 8, 1983, Sgaglione informed TIME–DC of the $265,423 demand, to be paid in monthly installments of $10,-723.93 commencing within sixty days of the February 8th letter. (Plaintiff's exhibit 29). On March 14, 1983, counsel for TIME–DC wrote back to Sgaglione to explain the strike, the resumption of operations, and the absence of a new collective bargaining agreement. In addition, counsel enclosed with the letter a copy of the then recent decision in *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund, Inc.*, 560 F.Supp. 294 (E.D.N.Y. 1983). In relevant part, the letter set forth the following:

> [I]t is not the intention of T.I.M.E.–DC to permanently cease operations within the jurisdiction of the New York Fund, and that T.I.M.E.–DC will resume operations within your jurisdiction as it is able to find new customers and to finance such operations.

(Plaintiff's exhibit 30 at 2). Sgaglione responded to this letter on March 25, 1983, advising of his intention to present the matter to the Fund Policy Committee at its April 4th meeting and assuring that the sixty-day notice letter dated February 8th would be held in abeyance pending that Committee meeting. (Plaintiff's exhibit 31). According to deposition testimony, Sgaglione agreed that he would give "two weeks' notice if [he] decided to reactivate [his] demand" and that "the sixty-day notice would not be running on them [(TIME–DC)]." (Deposition of Alphonse Sgaglione at 88–89, 144).

The Fund Policy Committee met on April 4, 1983 [4] and instructed Sgaglione to obtain more information. The minutes of that meeting reflect the following disposition:

> T.I.M.E.–DC... [is] allegedly involved in Labor Dispute with I.B.T. In view of the Eastern District Court Decision, the committee believed any attempt to collect EWL [withdrawal liability] from Employers not contributing due to a labor dispute would be a futile effort. These cases would be held in abeyance pending resolve of the dispute. Sgaglione instructed to write to I.B.T. Headquarters seeking information regarding status of the Labor dispute.

(Plaintiff's exhibit 32 at 2).

On April 18th, the Fund trustees met for the first time to discuss the TIME–DC situation. The full extent of the action taken was approval of the Policy Committee's instruction to Sgaglione to get more information. (Plaintiff's exhibit 32 at 6). Sgaglione had already written to the Teamsters on April 13th asking if they were striking at all and "[i]f the strike is settled, is the labor dispute continuing in the absence of a strike ...." (Plaintiff's exhibit 33). On April 20th, the Teamsters responded that "[t]he work stoppage was discontinued and the parties are in negotiations at the present time." (Plaintiff's exhibit 34). Sgaglione has acknowledged that the Teamsters' response meant that "the labor dispute continued at the present time." (Sgaglione deposition at 109–110). Moreover, Sgaglione was advised by TIME–DC's counsel, (plaintiff's exhibit 35), and the local unions, (plaintiff's exhibits 36, 37), that negotiations were continuing.

Notwithstanding his awareness of the ongoing negotiations, Sgaglione, by letter dated June 9, 1983, reasserted TIME–DC's withdrawal liability as detailed in the February 8th letter and demanded payment within fourteen days. (Plaintiff's exhibit

---

**4.** The Fund Policy Committee consists of Sgaglione and Rocco DePerno. DePerno serves as the labor representative and Sgaglione as the management representative. (Deposition of Rocco DePerno at 7; Sgaglione deposition at

93). Fund Policy Committee meetings are also attended by Peter Paravati, the Fund's attorney, and Sol Taber, the Fund's actuary. Defendant's Proposed Findings of Fact and Conclusions of Law, ¶ 18.

38).[5] Sgaglione did not consult with the trustees prior to sending the letter. (Sgaglione deposition at 106). Indeed, TIME–DC contends that the Fund's trustees were not even aware that TIME–DC was continuing to negotiate with the Teamsters. (Depositions of Victor Mousseau at 15–17; Jack Canzoneri at 25–26; Paul Bush at 30; T. Edward Nolan at 27, 37). The Fund, on the other hand, contends that, because Sgaglione distributed to all the trustees a letter sent to TIME–DC's counsel regarding the negotiations, the trustees must have known of such negotiations despite their testimony to the contrary. Moreover, TIME–DC argues that Sgaglione's decision to assert withdrawal liability was based on his misunderstanding of the relevant law. That is to say, although Sgaglione was aware of the labor dispute exception to withdrawal liability under the MPPAA, it was his understanding that once the strike itself was over, there was no longer a labor dispute even though TIME–DC and the Teamsters continued in their efforts to negotiate a contract. (Sgaglione deposition at 53–54).[6]

Faced with the Fund's persistent demand that withdrawal liability payments allegedly due and owing be paid, TIME–DC now seeks preliminary injunctive relief[7] restraining the Fund from enforcing or taking any action with respect to the claimed withdrawal liability.

---

**III**

The standards governing the issuance of a preliminary injunction in this circuit are by now well settled. A party must make "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see also Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983); *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 707 (2d Cir.1982). The moving party has the burden of proving each of these elements. *Robert W. Stark, Jr., Inc. v. New York Stock Exchange, Inc.*, 466 F.2d 743, 744 (2d Cir.1972) (per curiam). After careful review of all the evidence presented by the parties, this Court is persuaded that plaintiff has met its burden with respect to the propriety of preliminary injunctive relief and such relief therefore shall issue.

**IV**

The ultimate determination for this Court concerns whether or not TIME–DC is presently exempt from withdrawal liability

---

**5.** Unlike the initial February 8th notification letter which requested monthly payments of $10,723.93, the June 9th letter sought full payment within 14 days.

**6.** Deposition testimony revealed that, at the very most none of the other Trustees was anything more than vaguely familiar with the labor dispute provision of the MPPAA. *See* depositions of Paul Bush at 30–31; Victor Mousseau at 14–15; Jack Canzoneri at 17–19; Curtis Gunderson at 11–12; T. Edward Nolan at 30. Moreover, it appears that some trustees were wholly ignorant of why the Fund asserted withdrawal liability against TIME–DC. (Mousseau deposition at 8, 18; Gunderson deposition at 20).

**7.** TIME–DC also seeks permanent injunctive relief as well as a declaratory judgment that it either has not withdrawn from the Fund by reason of the labor dispute exception of the

MPPAA, 29 U.S.C. § 1398, or, if it is found to have withdrawn, that the withdrawal liability provisions of the MPPAA are unconstitutional insofar as they:

(a) infringe TIME–DC's right to due process of law guaranteed by the Fifth Amendment . . .

(b) infringe TIME–DC's rights to access to the courts and to a jury trial guaranteed by the Fifth and Seventh Amendments . . .

(c) impair TIME–DC's contract rights without the due process of law guaranteed by the Fifth Amendment . . . and

(d) take TIME–DC's property without just compensation in violation of the Fifth Amendment . . . .

Complaint at 16–17. Because this Court determines that TIME–DC is, at this point, exempt from withdrawal liability under the labor dispute provision, there is no need to address these constitutional challenges.

under the MPPAA. If in fact it is determined that TIME–DC is exempt, consideration must be directed to two additional questions, namely, whether plaintiff has sufficiently established the requisite irreparable harm and whether the failure of plaintiff to pursue the administrative remedies (i.e., arbitration) mandated by the MPPAA removes the jurisdiction of this Court.

### A. *Likelihood of success*

■ The labor dispute provision of the MPPAA provides, in relevant part, as follows:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
>
> . . . .
>
> (2) an employer suspends contributions under the plan during a labor dispute involving its employees ....

29 U.S.C. § 1398 (West Supp.1976–1982). The parties here have focused much of their energy toward urging what each perceives to be a proper construction of "labor dispute." Defendant Fund advances essentially three arguments supportive of its position that the present situation does not fall within the labor dispute provision of the MPPAA. First, the Fund argues that "Congress intended that a labor dispute was meant to be an actual work stoppage." Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 7. Second, defendant argues that TIME–DC and the Teamsters are not, notwithstanding their continuing negotiations, engaged in a "controversy"

involving the terms or conditions of employment. *Id.* at 12. Finally, defendant argues that an impasse in negotiations triggers withdrawal liability. *Id.* at 15.

Regarding congressional intent that "labor dispute" be synonymous with "work stoppage," defendant has adduced evidence which is meager at best. There simply is no persuasive support for defendant's contention that there must be a work stoppage in order to insulate an employer from withdrawal liability under the labor dispute exception. The excerpted statement from the Congressional Record[8] seems only to suggest that a dispute warranting employer protection exists so long as it entails only a temporary and not a permanent cessation of contributions. Here, as will be discussed below, the evidence and testimony all point to the fact that TIME–DC had not permanently ceased its operations. Moreover, it is clear that defendant's proposed definition of labor dispute is far too narrow when viewed in the context of other federal labor legislation. The Norris-LaGuardia Act defines a labor dispute as "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c). The National Labor Relations Act defines it as "any controversy concerning terms, tenure or conditions of employment ...." 29 U.S.C. § 152(9). Finally, the terms "strike" and "labor dispute" are separately defined in the Taft-Hartley Act which amended the National Labor Relations Act in 1947. A strike is defined as a "concerted stoppage of work," 29 U.S.C. § 142(2), while a "labor dispute" is defined as having "the same meaning as when used in [the National Labor Relations Act, 29 U.S.C.

---

**8.** *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 6 (quoting 126 Cong.Rec. 23,038 (1980) (remarks of Rep. Thompson)).

A further example of our intention that, consistent with the purposes of the bill, the courts and arbitrators look behind mere form or labels is in the context of a labor dispute. An employer is not considered to have withdrawn solely because it suspends contributions during a labor dispute. A temporary suspension of contributions during a strike or lockout would not be a permanent cessation

of an obligation to contribute within the meaning of section 4203 [29 U.S.C. § 1383]. However, consistent with the purposes of the bill, if the facts and circumstances of a particular situation indicate that contributions have ceased permanently—for example, all employees covered under the plan have been permanently replaced or the facility has been closed—the fact that the cessation of any contribution obligation was precipitated by a labor dispute does not mean that no withdrawal has taken place.

§ 152(9) ]," 29 U.S.C. § 142(3). To accept defendant's narrow definition would be to ignore a cardinal rule of statutory construction requiring that the same term, when used to describe the same legislative concern in the same statutory title, should have a single meaning. *See Northcross v. Board of Education*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973) (per curiam); *Hargrave v. OKI Nursery, Inc.*, 646 F.2d 716, 720 (2d Cir.1980).

Defendant maintains, however, that such a rule of statutory construction is inapplicable here for a number of reasons. First, defendant argues that the definitions of "labor dispute" appearing in 29 U.S.C. §§ 113(c), 142(3) and 152(9) are expressly limited by those very sections to the chapters or subchapters of the title in which each section appears. Acceptance of such a proposition, however, would necessarily render meaningless the rule described above, since nearly all statutory definitions are pro forma limited to their particular chapter. From this it certainly does not follow that Congress, in enacting a later chapter without express definitions, was not free to rely on those already contained in the relevant title. Second, defendant argues that the purposes of chapters 6 and 7 differ markedly from the purposes of chapter 18, and, therefore, the definitional sections of the former should not be applied to the latter. Specifically, defendant suggests that chapters 6 and 7 of title 29 were enacted to protect the rights of labor to organize and bargain collectively while chapter 18 was designed largely to protect the pension rights of employees. Concededly, the focus of each piece of legislation appears to be somewhat different. Nonetheless, it is clear that the MPPAA was enacted with an express concern for the policies underlying the Norris-LaGuardia Act and the two were intended to coexist in harmony. The House Report on the MPPAA noted that:

In revising ERISA to construct a statutory framework that will foster plan stability and growth, the committee has recognized the importance of preserving the integrity of the collective bargaining process while mandating standards of financial responsibility to ensure that benefit promises are met.

. . . .

Multiemployer plans are creatures of collective bargaining. The committee believes that the integrity of the collective bargaining process must be preserved to the utmost extent consistent with assuring the financial soundness of multiemployer plans to meet benefit commitments.

Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, 94 Stat. 1208, H.R. No. 96–869, pp. 51, 63, 1980 U.S.Code Cong. & Ad.News, 2918, 2919, 2931. To attribute differing meanings to what were hoped to be compatible statutes could only do injury to the congressional scheme. This conclusion finds additional support in the recent decision of Judge McLaughlin in *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund*, 560 F.Supp. 294 (E.D.N.Y.1983) ("*North Jersey*") which rejected the argument that the labor dispute had ended when the Teamsters agreed to return to work for TIME–DC. Specifically, Judge McLaughlin held:

> The dispute has not been resolved, however, because there is still no contract between TIME–DC and the Teamsters resolving the controversy. 29 U.S.C. § 152(9) defines "labor dispute" broadly, to include "any controversy concerning terms, tenure, or conditions of employment . . . ." The labor dispute thus continues, and the defendant's argument is unpersuasive.

560 F.Supp. at 303.[9]

Defendant next contends that "the facts of this case establish that there exists no

---

**9.** Defendant argues that the decision of Judge McLaughlin left unanswered the ultimate question of whether TIME–DC could claim immunity from withdrawal liability and is therefore irrelevant to the present case. While defendant is correct insofar as Judge McLaughlin did not

present labor dispute even if the Court accepts the expansive statutory definition of that term urged by the plaintiff." Defendant's Memorandum in Opposition at 11–12.[10] Defendant bases its argument on the facts that the strike has long since ended, that TIME–DC has reopened in selected areas of the country and that the parties are now actively engaged in collective bargaining sessions. Defendant therefore concludes that TIME–DC and the Teamsters are not now engaged in a "controversy" but rather only in "negotiations" for a new contract.[11] Interestingly, defendant does not choose to define "controversy" but is satisfied simply to contend that TIME–DC and the Teamsters are not engaged in one. Apparently, defendant

reasons that the fact the parties are engaged in conciliatory talks belies the existence of any controversy. It argues that to "bring [plaintiff's] assertion to its logical conclusion, TIME–DC must maintain that the MPPAA authorizes an employer to cease contributions to a pension plan without incurring withdrawal liability once a collective bargaining contract has expired and negotiations proceed." Defendant's Memorandum in Opposition at 14. Without passing on defendant's interpolation of plaintiff's arguments,[12] suffice it to say that negotiations stemming from a strike or other labor dispute must necessarily assume the existence of a controversy. A labor dispute obviously is precipitated by some disagreement between the parties

definitively pass on the applicability of the labor dispute exception, see 560 F.Supp. at 304, there can be no doubt that he did in fact attribute to the term "labor dispute" the expansive definition urged here by plaintiff and adopted by this Court. See id. at 303.

10. Defendant argues that even "[i]f this Court were to accept that there is a 'labor dispute' under the above sections, then it is without power to issue on [sic] preliminary injunction as to this 'labor dispute.' Chapter 6 removes such jurisdiction from federal courts and it is irrelevant, based on the definitions of 'labor dispute' in the above sections that the litigations [sic] here are not employer and union." Defendant's Memorandum at 12 n. *. Defendant cites to the case of *United Steelworkers of America v. Bishop*, 598 F.2d 408 (5th Cir.1979). It is clear, however, that defendant misconstrues both that decision and the purpose of the Norris-LaGuardia Act. The Norris LaGuardia Act bars injunctions which *themselves* interfere with a labor dispute. It does not bar the issuance of injunctions to prevent third parties, e.g., the Fund, from interfering with the labor disputes of others. The *Bishop* court noted "it is the *effect* of an injunction on the labor dispute to which the Act is addressed." 598 F.2d at 415 (emphasis added).

11. Worthy of mention is deposition testimony of certain trustees indicating their view that a labor dispute is not limited to strike situations but includes the negotiation period following a strike. For example, Trustee Nolan's testimony consisted of the following:

Q. As a representative for management at your company, does the presence or absence of pickets indicate when a strike is ongoing or over?

A. Presence or absence, no, it doesn't.

Q. At what point in time would you as a ..

A. An agreement is reached between the parties.

Q. A new collective bargaining agreement?

A. Yes.

(Nolan deposition at 24).

Similarly, Trustee Gunderson testified:

Q. What is your understanding, as a management person involved with trucking companies, of the meaning of the words "labor dispute?"

A. Well, labor dispute can mean a number of different things. It doesn't necessarily have to be a strike.

(Gunderson deposition at 36).

Finally, and perhaps most significant, is the deposition testimony of Fund Administrator Sgaglione:

Q. Is a dispute over wages and other terms and conditions of employment prior to resolving a collective bargaining agreement, a labor dispute, in your judgment?

A. That would be.

Q. And where the company and the union have disputed wages and other terms and conditions of employment, as they negotiate the collective bargaining agreement, that is a labor dispute, in your understanding?

A. That would be correct.

(Sgaglione deposition at 172).

12. It does in fact appear that an employer's duty to contribute to a fund survives the expiration of a collective bargaining agreement and that that obligation continues during negotiations for a new contract. *See, e.g., Producers Delivery Co. v. Western Conference of Teamsters Pension Trust Fund*, 654 F.2d 625 (9th Cir.1981); *Peerless Roofing Co. v. NLRB*, 641 F.2d 734 (9th Cir. 1981). The present case, however, deals with more than a simple expiration of a collective bargaining agreement.

and that disagreement or controversy necessarily continues until a resolution is achieved.

Finally, defendant suggests that an impasse will trigger withdrawal liability.[13] In fact, the concept of impasse is wholly irrelevant to the issues here. As merely a stage in the labor dispute, there is simply no talismanic significance to the presence of an "impasse."[14] To the extent an impasse reflects an even more serious labor dispute, its existence speaks persuasively to the presence of a "controversy." It is not at all unreasonable, however, to believe that renewed negotiations and, eventually, a contract will follow from an impasse. In any event, there is no evidence before this Court, and defendant does not suggest, that TIME–DC and the Teamsters were at any time confronted with an impasse.

It is clear that what the defendant Fund seeks is an interpretation of § 1398 that would give it discretion to assert withdrawal liability anytime after the employer suspends its pension contributions. Indeed, Fund Administrator Sgaglione insisted that a company must pay withdrawal liability under the MPPAA "whenever, [sic] such employer ceases to contribute to a Pension Fund, regardless of reason." (Plaintiff's exhibit 27). Such an interpretation of § 1398 would all but eviscerate the purpose of that section which is to protect an employer from withdrawal liability if it "suspends contributions under the plan during a labor dispute." 29 U.S.C. § 1398. In *I.A.M. National Pension Fund v. Schulze Tool & Die Co.*, 564 F.Supp. 1285 (N.D.Cal. 1983), the court reasoned that § 1398 "by its terms applies only to a suspension—a temporary interruption—because of a labor

dispute; it is evidently intended to prevent the risk of withdrawal liability from influencing labor-management negotiations when the employer has no intention of permanently withdrawing from the plan." 564 F.Supp. at 1295.

Defendant argues, in effect, that it should be entitled to presume that the temporary suspension here represented a "permanent cessation," entitling it to assert withdrawal liability. *See* 29 U.S.C. § 1383(a). The evidence before the Court points to the inescapable conclusion that defendant was not entitled to view the situation here as one involving permanent cessation. *See T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund*, 560 F.Supp. 294, 303 (E.D.N.Y.1983) ("In this case, Mr. Williamson testified at the hearing that T.I.M.E.–DC had not ceased operations.... Adherence to principles of fiduciary duty required the Fund to seek out just this sort of information before reaching a determination." (citations omitted)). A debilitating strike always raises some uncertainty as to whether an employer can fully restore its operations to their pre-strike level after the dispute ends. To speculate that permanency necessarily will follow a protracted dispute gives birth to a classic self-fulfilling prophecy. Precisely because withdrawal liability can visit untold ruin upon an employer which seriously impedes any opportunity to conclude a contract and restore pre-strike operations, *see* hearing testimony of Frank Williamson, Transcript at 42; hearing testimony of Eugene Anderson, Transcript at 69–75, any premature assertions of withdrawal liability must be scrupulously guarded against.

---

**13.** The contradiction presented by such an argument is evident. Not only does defendant argue that withdrawal liability attaches while negotiations continue, it now seeks to maintain that the liability continues once negotiations break off.

**14.** *I.A.M. National Pension Fund v. Schulze Tool & Die Co.*, 564 F.Supp. 1285 (N.D.Cal.1983) cited by defendant is not to the contrary. That case dealt with an impasse which marked a complete cessation of the company's activities with its union. The Court noted that if defendant

"reached impasse in its negotiations with the [plaintiff] *and took definite steps to implement its prior position that it would no longer participate in the Plan,* then at that point it permanently ceased to have an obligation to contribute to the Plan and, therefore, withdrew." *Id.* at 1296 (emphasis added). Clearly, the decision is not applicable to situations like the present where the arguable presence of an impasse does not signal any permanent cessation. *See id.* at 1295–96.

As a final matter, this Court notes the applicability of the decision of Judge McLaughlin in *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund, Inc.*, 560 F.Supp. 294 (E.D.N.Y.1983) to the situation at bar. The facts which served as the predicate for that action are shared almost entirely by the present one. Although the primary question before Judge McLaughlin was somewhat different than the one presented to this Court, Judge McLaughlin's inquiry and holding are nonetheless relevant here. Judge McLaughlin succinctly framed the question before him as the following:

> [W]hen an employer and union are locked in a labor dispute, may withdrawal liability be asserted based solely upon unsupported allegations that the employer has permanently ceased operations?

560 F.Supp. at 303.[15] Judge McLaughlin's conclusion was equally succinct, holding that

> a Fund that seeks to assert withdrawal liability against an employer claiming to fit within the labor dispute exception has, at minimum, a duty to undertake an inquiry of the factual circumstances. This rule is derived from the long-established requirement that pension funds act independently of the interests of both management and labor.

*Id.* (citations omitted). Critical to Judge McLaughlin's issuance of a preliminary injunction was his finding that the Fund administrator acted prematurely in asserting withdrawal liability without inquiring into the circumstances of TIME–DC's cessation of contributions, *id.*, and without fully apprising the Trustees of the nature of the problem.[16] Based on the evidence presented, this Court is persuaded that here, too, defendant acted prematurely in asserting withdrawal liability.

Defendant endeavors to avoid Judge McLaughlin's decision by repudiating the deposition testimony of five of its own trustees. At paragraph sixty-nine of Defendant's Proposed Findings of Fact and Conclusions of Law, the Fund boldly asserts that "the trustees knew of the [TIME–DC/Teamsters] negotiations despite their testimony." Even if defendant is correct in its assertion that the Trustees were aware of the labor dispute and the ensuing negotiations, it is clear beyond doubt that the Trustees never engaged in any deliberations or had any input into the decision to assert withdrawal liability. Indeed, Sgaglione concedes that he did not consult with the trustees prior to sending the June 9th demand. (Sgaglione deposition at 106). Moreover, the deposition testimony reveals that five of the Trustees had no knowledge of the labor dispute provision, *see* Bush at 30–31; Mousseau at 14–15; Canzoneri at 17–19; Gunderson at 11–12; Nolan at 30, and some concede they did not know why the Fund asserted liability, *see* depositions of Mousseau at 8, 18; Gunderson at 20. Finally, it is equally clear that Fund Administrator Sgaglione, who appeared to be acting unilaterally in the assertion of withdrawal liability, never undertook to inquire as to the permanency of TIME–DC's cessation of contributions. All Sgaglione inquired of was the status of the strike and the dispute, to which everyone responded that negotiations continued. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶¶ 55–56. Defendant seeks refuge in its misplaced assumption that the shutdown would be permanent. In its Proposed Findings of Fact, defendant claims that:

> liability even after full disclosure has been made to the Trustees because that factual situation is not now before me. I do find, however, that this motion raises "sufficiently serious questions going to the merits to make them a fair ground for litigation."

560 F.Supp. at 304 (quoting *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 707 (2d Cir.1982)).

---

**15.** Judge McLaughlin correctly noted the question to have been one of first impression. 560 F.Supp. at 303.

**16.** Judge McLaughlin concluded his opinion by noting:

> The preliminary injunction is based on the premature nature of the Fund's assertion of withdrawal liability. I do not express an opinion as to whether the statutory labor dispute exception precludes assertion of such

Within a few weeks of the strike, TIME–DC publicly announced its resolution to sell its trucking equipment and utilize the proceeds to enter a new business.

Defendant's Proposed Findings of Fact and Conclusions of Law, ¶ 29. At an evidentiary hearing before this Court held on September 23, 1983, Mr. Eugene K. Anderson, TIME–DC's chief financial officer testified only that the company resolved "to seek shareholder approval to sell trucking assets to pursue other business endeavors *if* [it were] unable to negotiate contracts with the Teamsters." (Transcript at 80) (emphasis added); *see also* Defendant's Memorandum in Opposition at 18 ("Anderson testified that in an SEC filing in December 1981, the company announced an intention to enter a new business *if* a satisfactory contract could not be negotiated with the teamsters") (emphasis added). Mr. Anderson testified further that TIME–DC did not presently have plans to enter a new business. (Transcript at 81). Moreover, there is no evidence in the record to support defendant's contention that TIME–DC's "plan to re-open in defendant's jurisdiction is indefinite and speculative, and it cannot say if the re-opening will take months or years even if a contract is negotiated and enacted." Defendant's Proposed Findings, ¶ 91. Indeed, Mr. Frank L. Williamson, TIME–DC's Senior Vice-President in charge of operations, testified that plaintiff's present plan of expansion would be "completely rework[ed]" if it secured a labor contract, (Transcript at 60–61), and that such a contract would greatly improve the company's ability to resume operations nationwide, *id.* at 70–71.

On balance, this Court cannot conclude other than that defendant's assertion of withdrawal liability was erroneous based on the labor dispute exception to the MPPAA. At the very least, the Fund's action was premature, as detailed in the opinion of Judge McLaughlin in *North Jersey*, 560 F.Supp. 294.

### B. *Irreparable harm*

■ This Court is persuaded that plaintiff has carried its burden of establishing the irreparable injury it will suffer if defendant is not enjoined from pursuing its withdrawal liability claims. Because of the Teamsters strike, TIME–DC lost nearly ten million dollars in shareholder equity, all of its general commodities customers, and most of its terminal employees. (Transcript at 69). The uncontradicted testimony of Mr. Williamson was to the effect that TIME–DC's renewed trucking operations would not survive the Fund's pursuit of withdrawal liability. Mr. Williamson explained that the Fund's action will drive away the shipping public because it creates the perception that TIME–DC will be closed. (Transcript at 39–40); *North Jersey*, 560 F.Supp. at 304 ("Such a claim, whether valid or not, sends a signal to people in the industry that the company in question is out of business"). Moreover, as plaintiff has argued, "[c]ompetitors will trumpet TIME–DC's situation to the industry in order to take away its present and prospective customers." Plaintiff's Memorandum at 17 (citing Transcript at 41–42). The net effect would be that "[they] are out of business" if the Fund proceeds. (Transcript at 42). The threats of diminished consumer confidence and elimination of business opportunities are clearly consequences constituting irreparable harm. *Doran v. Salem, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir.1977).

The testimony of Mr. Anderson established that TIME–DC cannot bear the added financial strain of the Fund's claim, "let alone the inevitable cascade of demands from the [other] funds," Plaintiff's Memorandum at 17, that would follow were an injunction denied here. Mr. Anderson detailed that the company can generate internally the cash it needs to continue its present operations and plans for expansion, (Transcript at 70), but that it cannot afford to pay the Fund's claim and "would be forced to discontinue [its] operations if [it]

were to pay that kind of money." (Transcript at 71).

Finally, plaintiff suggests that "[t]his Fund's claim ... cannot be viewed in isolation from the other 26 multiemployer funds to which TIME–DC has contributed, with potential claims of $30 million." Plaintiff's Memorandum at 18 (citing Transcript at 75). In particular, plaintiff points to the fact that six funds have already asserted withdrawal liability claims totaling two and one-half million dollars, (Transcript at 72; plaintiff's exhibit 40), of which monthly payments would aggregate to $118,000, (Transcript at 73; plaintiff's exhibit 40).[17]

Contending that TIME–DC is not faced with irreparable harm, defendant advances a number of arguments. First, defendant argues that, through its own actions, TIME–DC has announced to the public that its business will be confined to the west coast and that any expansion will be gradual. Indeed, defendant suggests that plaintiff's new San Francisco terminal is enjoying significant increases in business. Defendant's Proposed Findings at 25. Second, defendant argues that TIME–DC has resolved to sell off much of its trucking equipment and enter a new business. *Id.* Presumably, defendant construes such an intention to signify TIME–DC's resiliency and its ability to insulate itself from, or at least mitigate, the blow portended by the crippling effect of withdrawal liability. Finally, defendant contends that any harm plaintiff is likely to suffer is "speculative, remote and not imminent." Defendant's Memorandum at 22. This Court does not agree. It cannot be doubted that TIME–DC faces "a 'presently existing actual threat' rather than 'a possibility of a remote future injury.' " *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 756 (2d Cir.1977) (quoting *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d

614, 618 (3d Cir.1969)). Defendant has proffered no evidence controverting the testimony of Messrs. Anderson and Williamson detailing the financial ruin which an assertion of withdrawal liability will visit upon the company. The fact that west coast operations seem to be thriving does not detract from the overall picture of gloom painted by the company's officers. Quite simply, the evidence has established beyond any doubt that TIME–DC would suffer a devastating blow were the Fund permitted to assert withdrawal liability. What defendant has termed speculative, that is, the possibility that other Funds will similarly pursue their withdrawal liability claims, only compounds the potential disaster. While all threatened harms are to some extent only speculative, the totality of the evidence in the present case persuades this Court that the feared harm has transcended mere speculation and rises to the level of the actual and imminent. A number of other funds have already demonstrated their intentions to pursue withdrawal liability, and TIME–DC's competitors already have demonstrated their proclivities to use the bad news about the pension funds to hurt TIME–DC with its customers. This court views the specter of business failure looming on the horizon as not mere conjecture or paranoia on the part of TIME–DC but as a distinct likelihood in the event the Fund is permitted to press its claims for withdrawal liability. Accordingly, entry of a preliminary injunction is warranted on the facts of this case.

### C. *Exhaustion of administrative remedies*

■ The MPPAA mandates that all disputes concerning withdrawal liability must initially be resolved through arbitration and that scheduled payments of that liability must continue to be made during that process. 29 U.S.C. §§ 1401(a) & (d);

---

**17.** As a final matter, this Court concludes, as did Judge McLaughlin in *North Jersey*, that the balance of hardships tips decidedly in favor of plaintiff. It does not appear that the Fund requires TIME–DC's contributions for any immediate purpose since, over the last five years, TIME–DC's contributions amounted to less than

0.1% of the Fund's total contributions from all employers. (Sgaglione deposition at 82–83). Moreover, the record establishes that the Fund enjoys income of nearly $14 million in excess of its current obligations. (Plaintiff's exhibit 44 at 4).

*Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 298 (3d Cir.1982); *Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Kahn Brothers,* 550 F.Supp. 36 (S.D.N.Y.1982). The general rule that, "[w]here Congress has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful function to anticipate the administrative decision with their own ...," *Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 767, 67 S.Ct. 1493, 1501, 91 L.Ed. 1796 (1947), is here not disputed, and at least one district court has held that this doctrine applies to the MPPAA, *see Terson Co. v. Pension Benefit Guarantee Corp.,* 565 F.Supp. 203 (N.D.Ill.1982). Nonetheless, there are two exceptions which have grown up around the exhaustion requirement which are relevant here. First, exhaustion is not required "when the nonjudicial remedy is clearly shown to be inadequate to prevent irreparable injury." *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 293 (3d Cir. 1982). Second, the exhaustion requirement is similarly inapplicable when the issues presented to the court revolve around statutory interpretation. *Touche Ross & Co. v. S.E.C.,* 609 F.2d 570, 576–77 (2d Cir.1979). "These exceptions reflect an underlying perception that arbitrators and administrative agencies need not be resorted to when there is 'no need for agency expertise or the exercise of agency discretion.'" *North Jersey,* 560 F.Supp. at 302 (quoting *Touche Ross,* 609 F.2d at 577).

■ Defendant argues that "only *rarely* will administrative action threaten an irreparable injury as to justify interlocutory resort to corrective judicial processes," Defendant's Memorandum at 23 (emphasis in original) (citing *Bristol-Myers Co. v. FTC,* 469 F.2d 1116, 1118 (2d Cir.1972)), and that plaintiff has not shown such injury here. This Court does not agree. Here, the injury required to avoid the arbitration process is the same injury required by law for the issuance of a preliminary injunction. To the extent this Court has concluded that

TIME–DC has established irreparable injury in the preliminary injunction context, it has established that necessary to avoid arbitration. *Republic Industries,* 693 F.2d at 293. Because the arbitration provision of the MPPAA requires payment of asserted withdrawal liability *during* the arbitration process, compelling TIME–DC to repair to arbitration would defeat its purpose in seeking preliminary injunctive relief.

Even more importantly, however, the fundamental question presented to the Court and underlying the dispute between the parties, concerns a statutory interpretation of the MPPAA. Accordingly, under *Touche Ross & Co. v. S.E.C.,* 609 F.2d 570, 576–77 (2d Cir.1979), arbitration clearly is inappropriate. *I.A.M. National Pension Fund v. Schulze Tool & Die Co.,* 564 F.Supp. 1285, 1294 (N.D.Cal.1983) ("The issue presented here requires an interpretation of a federal statute, the MPPAA, and an application of principles drawn from the body of federal labor law to facts that are essentially undisputed. Both requirements are more suitably met in a federal court than in arbitration"); *North Jersey,* 560 F.Supp. at 303.

V

On balance, this Court concludes that plaintiff has carried its burden of establishing the need for and propriety of a grant of preliminary injunctive relief and a preliminary injunction shall issue. The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

It is so Ordered.